Filed 7/17/19

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u><sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| WENDELL BROWN, | C082826 |
| Plaintiff and Respondent, | (Super. Ct. No. 34201300148356CUOEGDS) |
| v. | |
| CITY OF SACRAMENTO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, James P. Arguelles, Judge. Affirmed.

Liebert Cassidy Whitmore, Jesse J. Maddox, and Michael D. Youril for Defendant and Appellant.

Law Offices of Richard A. Lewis and Richard A. Lewis for Plaintiff and Respondent.

---

<sup>*</sup> Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts A.2 and B of the Discussion section.

1

Plaintiff Wendell Brown sued his employer, the City of Sacramento (City), for racial discrimination and retaliation in violation of the California Fair Employment and Housing Act (FEHA). (Gov. Code, § 12900 et seq.) A jury returned a verdict in Brown's favor. The City moved for judgment notwithstanding the verdict and a new trial. The trial court granted the motion for judgment notwithstanding the verdict in part, finding that Brown failed to exhaust administrative remedies with respect to some of the acts found to be retaliatory. The trial court denied the motion with respect to other acts and effectively denied the motion for a new trial.[1]

The City appeals from the order partially denying the motion for judgment notwithstanding the verdict, arguing the remaining retaliation and discrimination claims are time-barred and barred for failure to exhaust administrative remedies. The City also appeals from the order partially denying the motion for a new trial, arguing that juror misconduct deprived the City of a fair trial, and the trial court prejudicially erred in admitting evidence of the purportedly unexhausted and time-barred claims. Finding no error, we affirm.

## I. BACKGROUND

Brown, an African-American, began working for the Solid Waste and Recycling Division (Division) of the City's Utilities Department (and later, the General Services Department) in August of 1986, and was eventually promoted to Solid Waste Supervisor. Brown is a member of the International Union of Operating Engineers, Stationary Engineers, Local 39 (Union). The City has a collective bargaining agreement with the Union.

---

[1] As we shall discuss, the trial court conditionally granted the motion for a new trial with respect to a single act found to have been retaliatory, as to which the motion for judgment notwithstanding the verdict had been granted.

2

Brown filed an administrative complaint with the Department of Fair Employment and Housing (DFEH) and immediately received a right to sue letter.[2] On July 22, 2013, Brown filed a complaint against the City, alleging causes of action for racial discrimination and retaliation under FEHA.[3] The matter was tried before a jury over the course of several weeks in mid-May and early June 2016.

A.    *Jury Trial*

The jury heard evidence that Brown complained about conduct he believed to be discriminatory and suffered the following adverse employment actions: (1) a suspension for altering a jury duty form; (2) a suspension for illegal dumping; (3) a transfer from one operational facility to another; (4) a shift change; (5) a denial of promotion in 2013; and (6) a denial of promotion in 2014. We summarize these actions briefly below, including only those facts necessary to understand and resolve the limited issues before us.

1.    *The Altered Jury Service Form Incident*

Brown was working on a garbage collection truck on July 6, 2010. He received a telephone call from Rashid El Amin, an employee under his supervision. El Amin, who had been summoned for jury duty that day, explained that he had just been released and wanted to know if he should report to work. Brown determined that El Amin was not in uniform and would need several hours to go home, change, and then travel to work. Even then, Brown reasoned, there would be no work for El Amin to do, as all of the garbage collection trucks had already been dispatched for the day. Accordingly, Brown told El Amin he could stay off the rest of the day, if he used his "bank time." The next

---

[2] The allegations of the DFEH complaint are discussed *post.*

[3] Other parties and causes of action were dismissed before and during the trial.

day, El Amin reported to work with a jury service form, which Brown altered to reflect a full day of jury service.[4] Sometime thereafter, a fact-finding investigation ensued.

On January 6, 2011, Brown received a letter indicating the City intended to take disciplinary action against him pursuant to the Rules and Regulations of the Civil Service Board (Rules). Specifically, the letter indicated the City intended to suspend Brown for four days, unless Brown responded by January 7, 2011, either orally or in writing. Brown thought the contemplated discipline was unfair and unreasonable, as there were no guidelines on how to record an absence for jury duty for less than a full day, and Brown had been candid about the fact that he had altered the jury form. Nevertheless, Brown kept these views to himself, and the City subsequently issued another letter, stating, "you are hereby suspended without pay for four (4) working days from your position as Solid Waste Supervisor and from City service, effective February 7, 2011." Although the suspension was slated to become effective on February 7, 2011, Brown's salary was never reduced, and he never served the suspension. The February 2011 suspension was the first time that Brown was subjected to discipline in almost 25 years of service, but it was not the last.

### 2. *The Illegal Dumping Incident*

In August 2011, Brown received a call from a supervisor asking him to collect some burned out garbage cans from a Sacramento street.[5] Brown instructed two subordinate employees, both veterans of the Division, to retrieve the cans and take them to an isolated area near Western Avenue, where they would not pose a fire hazard to

---

[4] During the trial, Brown testified that he submitted the altered jury service form with another form, indicating that El Amin was requesting vacation for the time that he was not occupied with jury service. The City has not been able to locate the vacation request form.

[5] This request was unusual, as the Division was not ordinarily responsible for handling such matters.

4

nearby homes or structures. Brown knew that Western Avenue was home to an illegal dumping site and anticipated that the cans would be collected later, after the fire risk had abated. Approximately one month later, Brown learned that the employees responsible for taking the cans to Western Avenue were being disciplined for illegal dumping.

Brown discussed the matter with Steve Harriman, an integrated waste general manager and Brown's indirect supervisor. Brown told Harriman that he did not believe the employees should be disciplined, as they had only been following Brown's orders. Brown's message was not well received. After the meeting, Brown had the impression that Harriman "was dead set on [he] did the worse thing possible in the world by handling it the way that [he] did it."

Around the same time, Brown received a letter indicating that the City intended to take disciplinary action against him as well. The letter opined that Brown's conduct constituted cause for discipline within the meaning of the Rules, and indicated that the City intended to reduce Brown's pay for 40 bi-weekly pay periods, equivalent to 16 days. The letter, which was signed by Harriman and others, advised Brown that he had a right to respond within 15 days. Brown viewed the contemplated discipline as out of proportion to the offense, and began to suspect a discriminatory motive.

Brown responded to the letter by requesting a *Skelly* hearing.[6] The *Skelly* officer found that Brown had been trying to do the right thing under difficult circumstances and recommended that he receive a written reprimand. Brown's supervisors considered the *Skelly* officer's recommendation and decided to reduce the contemplated discipline.

---

[6] "A *Skelly* hearing is an opportunity for the employee to respond to the charges in the notice of adverse action." (*Benefield v. Department of Corrections and Rehabilitation* (2009) 171 Cal.App.4th 469, 472, fn. 6; see *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 206 (*Skelly*).)

5

On February 27, 2012, Brown received a second letter stating: "This letter is to inform you that your salary as a Solid Waste Supervisor is hereby reduced . . . for twenty (20) bi-weekly pay periods [equivalent to eight days] effective with the pay period beginning March 10, 2012." The second letter characterized the dumping incident as a cause for disciplinary action within the meaning of the Rules, and concluded: "Pursuant to Rule 12.7 of [the Rules], you have the right to appeal this disciplinary action to the Civil Service Board within fifteen (15) calendar days from the date you receive this letter."

Brown appealed the suspension (which was to have been served by means of the pay reduction described above). While the appeal was pending, Brown's union representatives attempted to negotiate a further reduction of the suspension. These negotiations continued through October 2012. On October 29, 2012, the City offered to reduce the suspension from eight to five days in exchange for Brown's agreement to waive his right to post-disciplinary arbitration. The Union, believing the City's offer to be reasonable, informed Brown by letter dated November 13, 2012, that it would no longer represent him in connection with the appeal. The Union provided Brown with a copy of the Rules, and informed him that the appeal would be dismissed if he did not pursue the matter independently. Brown did not pursue the matter, and the appeal was eventually dismissed.

Shelley Banks-Robinson, a labor relations manager for the City, explained that the disciplinary process typically begins with a notice of intent specifying the causes for potential discipline, and ends with a final notice announcing the City's final decision as to what discipline should be imposed. Although the employee has the right to appeal that decision, Banks-Robinson opined that the discipline becomes "final" with the issuance of the final notice.

Banks-Robinson could not say with certainty whether Brown served the suspension set forth in the City's second letter (which all parties characterized as a "final

6

notice"). Nevertheless, she theorized that Brown had likely already served the suspension by the fall of 2012, notwithstanding the pendency of his appeal. When asked how Brown could have served the suspension when the period of suspension was the subject of ongoing negotiations between the City and Brown's union representatives, Banks-Robinson responded that, had a settlement been reached, Brown would have been entitled to a refund of money previously withheld from his bi-weekly paychecks. As we shall discuss, the Rules do not support Banks-Robinson's theory—which the City renews on appeal—that disciplinary action becomes final on the date of the final notice.

3.    *The Transfer to Meadowview*

On February 13, 2013, Brown received a memorandum from Harriman announcing that he would soon be transferred from the Division's operational facility in North Sacramento (the North Area Corporation Yard or NACY) to an operational facility in South Sacramento (Meadowview Yard). The memorandum instructed Brown and another solid waste supervisor to report to their "new Permanent Dispatch Area" on April 15, 2013. Brown was "irritated" and "felt very strongly that [the move] didn't make any sense."

During the trial, Brown explained that he had started his career at Meadowview and worked hard to make a place for himself at NACY, which was closer to his home. Brown suspected the transfer was retaliatory, as he had recently complained about the way Harriman handled disciplining African-American and Hispanic employees at NACY. Although Harriman offered a business reason for the move, Brown viewed the stated reason as flimsy and pretextual. And, though the City characterized the move as a temporary "rotation," the evidence showed that Brown had been stuck at Meadowview for three years at the time of trial.

4.    *The Shift Change*

On June 17, 2013, Brown received a memorandum from another supervisor, William Skinner, stating that he would be changing from the early morning shift to the

7

late morning shift. Brown was unhappy about the change, as the later start time meant that he would be spending more time commuting and less time with his family. During the trial, Brown testified that he viewed the shift change as part of a pattern of retaliation, which he believed to be a response to his having voiced concerns about discriminatory behaviors within the Division. Brown worked the late shift for three months, after which, another supervisor started working the shift.

### 5. *Denial of Promotion in 2013*

Brown applied for a promotion within the Division in August 2013. Brown was among the finalists for the position but was not selected. Instead, the City hired another applicant.

### 6. *Denial of Promotion in 2014*

Brown applied for another promotion in February 2014. As before, Brown was among the finalists for the position. Again, he was not selected. This time, the successful candidate was African American. Unlike Brown, who was by then a 27-year veteran of the Division, the successful candidate had no experience with solid waste management.

## B. *Verdict*

The jury rendered a special verdict in Brown's favor on June 6, 2016. With respect to the discrimination claim, the jury found that race was a substantial motivating reason for the City's decision to transfer Brown to Meadowview in April 2013. With respect to the retaliation claim, the jury found the City retaliated against Brown in connection with the illegal dumping suspension, the transfer to Meadowview, the shift change, and the denial of promotion in 2014. The jury found no liability for the jury duty suspension or the denial of promotion in 2013. The jury awarded total damages in the amount of $558,450, an amount that included $22,050 in past lost earnings and $75,000 in future lost earnings.

8

The trial court polled jurors about their votes. With respect to the discrimination claim, the polling revealed a 12-0 vote in favor of a finding that the transfer to Meadowview constituted an adverse employment action, and a 10-2 vote in favor of the finding that race was a substantial motivating reason for the transfer. The jury rejected the affirmative defense that the City had a non-discriminatory reason for transferring Brown to Meadowview by a vote of 10-2.

With respect to the retaliation claim, the polling revealed a 12-0 vote in favor of a finding that the transfer to Meadowview constituted an adverse employment action, an 11-1 vote in favor of findings that the suspension arising from the dumping incident and shift change constituted adverse employment actions, and a 9-3 vote in favor of a finding that the 2014 denial of promotion constituted an adverse employment action. The jury voted 11-1 in favor of a finding that retaliation was a substantial motivating reason for all of the alleged retaliatory acts, and a 10-2 vote in favor of a finding that retaliation was a substantial motivating reason for the suspension, the transfer, the shift change, and the denial of promotion. The jury rejected the affirmative defense that the City had non-retaliatory reasons for all of the alleged retaliatory acts by a vote of 11-1, and for the suspension, transfer, shift change, and denial of promotion by a vote of 10-2.

C.     *Juror Misconduct*

After the verdict, the City's trial counsel learned that one of the jurors—Juror No. 2—failed to disclose pertinent information during voir dire. Specifically, Juror No. 2 failed to disclose she had served as lead plaintiff in a putative wage and hour class action against an employer. As we shall discuss, Juror No. 2's misconduct raised a rebuttable presumption of prejudice (*In re Hamilton* (1999) 20 Cal.4th 273, 295) and served as the basis for the City's new trial motion.

D.     *Post-Trial Motions*

On June 22, 2016, the City filed a motion for judgment notwithstanding the verdict, arguing that Brown's claims were time-barred or barred for failure to exhaust

9

administrative remedies.  As relevant here, the motion argued that the jury should not have been allowed to hear about either of the suspensions (despite the fact that the jury rejected Brown's claims regarding the suspension for his alteration of the employee's jury service form), as both suspensions occurred outside the one-year statute of limitations for violations of FEHA (Gov. Code, § 12965, subd. (d)).  The motion also argued that Brown failed to exhaust his administrative remedies with respect to the transfer to Meadowview, the shift change, and the denials of promotion (despite the fact that the jury rejected Brown's claims based on the 2013 denial of promotion).

On July 8, 2016, the City filed a motion for a new trial on grounds of irregularity in the proceedings and juror misconduct.  (Code Civ. Proc., § 657, subds. (1)-(2).)  The new trial motion was supported by a declaration from the City's trial counsel, Jesse Maddox.  Although voir dire proceedings had not been transcribed, Maddox averred that he specifically asked prospective jurors whether they had " 'ever brought a lawsuit against someone,' " whether they " 'ever felt they were treated unfairly in the workplace,' " and whether they " 'ever witnessed unfair treatment at work.' "  Maddox further averred that Juror No. 2 failed to affirmatively respond to any of these questions.  Had she done so, Maddox continued, he would have challenged Juror No. 2 for cause or used a peremptory challenge to strike her from the jury.  The new trial motion also argued the trial court prejudicially erred in allowing the jury to consider evidence of time-barred and unexhausted acts.

The trial court addressed both motions in an order dated August 8, 2016.  The trial court began with the motion for judgment notwithstanding the verdict, which was granted in part and denied in part.  The trial court agreed with the City that Brown failed to exhaust his administrative remedies with respect to the shift change and denial of promotion in 2014.  Accordingly, the trial court granted the motion for judgment notwithstanding the verdict with respect to those issues and amended the judgment to

10

strike the past and future lost earnings awards, both of which were based on the 2014 denial of promotion.

The trial court rejected the City's argument—also advanced on appeal—that the suspensions were barred by the applicable statute of limitations (Gov. Code, § 12960, subd. (d)), finding that "there was conflicting evidence as to whether the incidents involving the jury-slip discipline and dumping discipline were time-barred and/or fell within the continuing violations theory." The trial court also rejected the City's argument that the transfer to Meadowview was barred for failure to exhaust administrative remedies, noting that the DFEH complaint recited " 'denied or forced to transfer' " as a ground for the alleged discrimination and harassment, and finding that "any DFEH investigation would have likely encompassed this incident." As we shall discuss, we find no reversible error in the partial denial of the motion for judgment notwithstanding the verdict.

The trial court then turned to the City's new trial motion. The trial court independently recalled that Juror No. 2 was "overly enthusiastic . . . (in terms of body language, head-nods, etc.) in favor of [Brown's] case right from the opening statement." The trial court admitted the Maddox declaration, finding that the averments contained therein, combined with the court's independent recollections of the voir dire proceedings, established juror misconduct and raised a rebuttable presumption of prejudice. (See *In re Hamilton, supra,* 20 Cal.4th at p. 295; see also *Wiley v. Southern Pacific Transportation Co.* (1990) 220 Cal.App.3d 177, 189 ["a juror's intentional concealment of relevant facts or giving false answers during the voir dire examination constitutes misconduct and raises a presumption of prejudice"].)

The trial court then shifted the burden to Brown to rebut the presumption of prejudice. Brown attempted to rebut the presumption with declarations from Juror No. 2, Juror No. 6, and Juror No. 12. The trial court refused to consider Juror No. 2's declaration, finding that she lacked credibility. The trial court also struck substantial

11

portions of the declarations from Juror No. 6 and Juror No. 12, but admitted portions from both averring that, " '[a]t no time did juror #2 speak of a prior lawsuit.' "

The trial court then considered whether the admissible portions of the declarations from Juror No. 6 and Juror No. 12 were sufficient to rebut the presumption that the City suffered prejudice as a result of Juror No. 2's misconduct. To answer this question, the trial court examined the numerical vote for each of the jury's findings (set forth above). The trial court found that Brown rebutted the presumption of prejudice with respect to the discrimination and retaliation claims based on the transfer to Meadowview, suspension for illegal dumping, and shift change, which were decided by 12-0, 11-1, and 10-2 votes.[7] The trial court found that Brown failed to rebut the presumption with respect to the retaliation claim based on the 2014 denial of promotion, which was decided by a 9-3 vote. Accordingly, the trial court conditionally granted the motion for a new trial with respect to the 2014 denial of promotion. Because the trial court had previously granted the City's motion for judgment notwithstanding the verdict on that issue, the trial court made clear that the order granting a partial new trial would only be effective in the event that the former order were reversed on appeal, and no appeal was taken from the latter order, or the latter order was affirmed on appeal.

The City filed a timely notice of appeal.

---

[7] The City observes that the trial court appears to have miscounted some of the votes. As we shall discuss, any error was harmless.

## II. DISCUSSION

A. *Motion for Judgment Notwithstanding the Verdict*[8]

"A trial court must render judgment notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted. [Citation.]  A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support.  [Citation.]  [¶] The moving party may appeal from the judgment or from the order denying the motion for judgment notwithstanding the verdict, or both.  [Citation.]  As in the trial court, the standard of review is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)  However, to the extent a motion for judgment notwithstanding the verdict raises legal issues such as the application of law to undisputed facts or the interpretation of a statute or contract, we review the trial court's ruling on the motion de novo.  (See *Mason v. Lake Dolores Group* (2004) 117 Cal.App.4th 822, 829-830; *Gunnell v. Metrocolor Laboratories, Inc.* (2001) 92 Cal.App.4th 7170, 718-719.)

1. *Statute of Limitations*

The City argues the trial court erred in denying its motion for judgment notwithstanding the verdict with respect to both suspensions, as the City claims they occurred outside the one-year statute of limitations for violations of FEHA (Gov. Code, § 12965, subd. (d)).  We need not decide whether the trial court erred in denying the

---

[8] Brown urges us to dismiss the City's appeal on the grounds that the trial court's order is non-appealable.  According to Brown, an earlier notice of appeal, which has not been made part of the record, stayed proceedings and divested the trial court of subject matter jurisdiction to enter the order granting in part and denying in part the motions for judgment notwithstanding the verdict and for a new trial.  We decline to consider this argument, as it is not adequately supported by the record.

motion with respect to the suspension for alteration of the jury service form, as the jury found that act was not a basis for liability. Having secured a favorable verdict with respect to the jury form suspension, the City was not "aggrieved" by the denial of the motion and cannot complain on appeal.[9] (*Holt v. Booth* (1991) 1 Cal.App.4th 1074, 1079-1080.) We therefore confine our discussion to the February 2012 suspension.

A plaintiff asserting a cause of action arising under FEHA must first file a timely complaint with the DFEH and obtain the agency's permission to file a civil action in court. (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 492.) To be timely, the administrative complaint must generally be filed within "one year from the date upon which the alleged unlawful practice or refusal to cooperate occurred." (Gov. Code, § 12960, subd. (d).) An "unlawful practice" may occur as a discrete act, such as a discriminatory termination of employment or failure to hire. (See, e.g., *Romano v. Rockwell Internat., Inc., supra,* at p. 495.) It may also consist of a course of conduct over a period of time. (See, e.g., *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1059.)

The FEHA statute of limitations ordinarily bars recovery for acts occurring more than one year before the filing of the DFEH complaint. (*Jumaane v. City of Los Angeles* (2015) 241 Cal.App.4th 1390, 1402.) When, however, an unlawful course of conduct begins outside the limitations period and continues to a date within the limitations period, "the continuing violation doctrine comes into play." (*Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 812.) Under this doctrine, an employer can be liable for conduct outside the limitations period "if the employer's unlawful actions are (1) sufficiently similar in kind . . . ; (2) have occurred with reasonable frequency; (3) and have not acquired a

---

[9] The City elsewhere argues the trial court's denial of a pretrial motion to exclude the suspensions was an evidentiary error requiring a new trial. We address this argument *post.*

14

degree of permanence." (*Id.* at p. 823.) The "plaintiff has the burden of proof to show his or her claims are timely under the continuing violation doctrine." (*Jumaane v. City of Los Angeles, supra,* at p. 1402.)

The City argues the dumping suspension was a discrete act that was completed on February 27, 2012, more than a year before the DFEH complaint was filed on March 5, 2013. Brown responds that the appeal process was "underway and ongoing as late as November 1, 2012." We assume without deciding that the suspension was a discrete act, rather than a continuing violation. (See *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 65-66 [the continuing violation doctrine does not apply to unrelated discrete acts, such as a series of rejected job applications]; see also *National Railroad Passenger Corporation v. Morgan* (2002) 536 U.S. 101, 114 ["Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice' "]; and see *O'Connor v. City of Newark* (2016) 440 F.3d 125, 127 [wrongful suspension and wrongful discipline are discrete acts]; *Bass v. Joliet Public School District No. 86* (7th Cir. 2014) 746 F.3d 835, 839-840 [reassignment of duties and suspensions are discrete acts].) Even so assuming, we conclude that Brown's claim based on the dumping suspension was timely.

As noted, Brown is a member of the Union, which has a collective bargaining agreement with the City. The collective bargaining agreement gives the City the right to discipline employees in accordance with the Rules. The Rules govern the disciplinary process for union members employed by the City and serve as the express basis for the dumping suspension.

The Rules define the term "disciplinary action" to include letters of reprimand, suspensions, and in-grade salary reductions. The Rules further provide, under the heading, "Date Discipline Final," that: "Disciplinary action shall be final: [¶] (a) When

the time for appeal to the Board has run, and no appeal has been timely filed; or [¶] (b) After the Board's determination of the matter at the hearing pursuant to Rule 12.10(d)."[10] Applying the Rules, we conclude the dumping suspension became final sometime in late 2012, when Brown's appeal was dismissed. Accepting the premise that the dumping suspension was a discrete act, the act became final in late 2012, within the one-year limitations period. The claim based on the dumping suspension was therefore timely.[11]

---

[10] Rule 12.10(d), titled "Time for seeking judicial review," provides: "Judicial action to review any decision of the Board pursuant to this Rule shall be filed within the time limits prescribed in Code of Civil Procedure Section 1094.6. Notice of such time limit shall be given to the appellant in writing at the time the Director serves the findings and decision on appellant pursuant to subsection (d) [*sic*] above."

[11] The City's arguments and authorities do not convince us otherwise. Relying on *Morgan v. Regents of University of California,* the City argues that the mere continuing impact from past violations is not actionable. (*Morgan v. Regents of University of California, supra,* 88 Cal.App.4th at p. 64.) That argument might have had relevance had the discipline become final on February 27, 2012, as the City contends. In that circumstance, the fact that Brown suffered the effects of the discipline in late 2012 and 2013 (by means of bi-weekly salary reductions) might not have been enough to bring the claim within the one-year limitations period. But that is not the situation before us. Here, the discipline did not become final—and the violation could not be considered complete—until sometime in late 2012. We need not concern ourselves with the "continuing impact from past violations" because the violation itself occurred within the one-year limitations period.

The City's reliance on *Delaware State College v. Ricks* (1980) 449 U.S. 250 for the proposition that "the pendency of a grievance . . . does not toll the running of the limitations periods," misses the mark for similar reasons. (*Id.* at p. 261.) We need not decide whether the statute of limitations was tolled because we conclude that, under the Rules, the limitations period did not begin to run until sometime in late 2012, after the appeals process had run its course.

### 2. *Exhaustion of Administrative Remedies*

Next, the City argues the trial court erred in denying the motion for judgment notwithstanding the verdict with respect to the discrimination and retaliation claims based on the transfer to Meadowview. We are not persuaded.

Before filing an action for damages under FEHA, an employee must exhaust his or her administrative remedies by filing a verified complaint with the DFEH and obtaining a right-to-sue notice from the agency. (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 153 (*Wills*).) The DFEH complaint must be filed within one year of the alleged unlawful acts, state the names of the perpetrators, and set forth the particulars of the alleged acts. (Gov. Code, § 12960, subds. (b), (d).) Thus, a plaintiff cannot sue for an act violating FEHA unless the plaintiff "specif[ied] that act in the administrative complaint." (*Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1724.) Exhaustion of administrative remedies is " 'a jurisdictional prerequisite to resort to the courts.' " (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 70.)

The administrative exhaustion requirement is satisfied if FEHA claims in the judicial complaint are " 'like and reasonably related to' " those in the DFEH complaint (*Wills, supra,* 195 Cal.App.4th at p. 154) or "likely to be uncovered in the course of a DFEH investigation" (*Okoli v. Lockheed Technical Operations Co.* (1995) 36 Cal.App.4th 1607, 1617 (*Okoli*)). In determining whether Brown timely exhausted his administrative remedies on the transfer to Meadowview claims, we must construe the DFEH complaint "liberally" and "in light of what might be uncovered by a reasonable investigation." (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 268.)

As noted, Brown filed a DFEH complaint on March 5, 2013. At the time of the filing, the transfer to Meadowview had been announced (on February 13, 2013), but was not scheduled to take effect for another eight weeks (on April 15, 2013). The DFEH complaint alleges that Brown experienced discrimination, harassment, and retaliation on the basis of race and age. The DFEH complaint further alleges that, as a result of the

17

alleged discrimination, harassment, and retaliation, Brown was, "Denied a good faith interactive process, Denied a work environment free of discrimination and/or retaliation, Denied equal pay, Denied or forced to transfer, Denied promotion, Other." The DFEH complaint describes the dumping suspension at length, and discusses other matters not relevant here, but does not say anything else about the transfer to Meadowview.

Relying on *Okoli,* the City argues that Brown failed to exhaust his administrative remedies with respect to the transfer to Meadowview, which was completed after the filing of the DFEH complaint. *Okoli* is distinguishable. There, the plaintiff, Charles Okoli, filed a DFEH complaint alleging that he was denied a promotion on the basis of his race and national origin. (*Okoli, supra,* 36 Cal.App.4th at pp. 1609-1610.) Okoli obtained a right-to-sue-notice and then filed a civil action alleging racial and national origin discrimination, racial harassment, and retaliation against his employer, Lockheed Technical Operations Company. (*Id.* at p. 1610.) The retaliation claim was based on adverse employment actions that he claimed were the result of his filing the DFEH charge. (*Id.* at pp. 1613, 1617) The jury returned defense verdicts on the causes of action for discrimination and harassment, but found for Okoli on the retaliation claim. (*Id.* at p. 1612.) Lockheed appealed, arguing Okoli never mentioned retaliation in his DFEH complaint, and thus the trial court lacked jurisdiction to hear the claim under the exhaustion of remedies doctrine. (*Id.* at p. 1609.) The appellate court agreed and reversed. (*Id.* at p. 1612.) The court concluded that "the unlawful retaliation, which occurred *after* the filing of the DFEH charge, would not reasonably have been uncovered in an investigation of the charges that were made, i.e., why Okoli had not been promoted" and whether his supervisor had made derogatory comments about his national origin. (*Id.* at p. 1617.) Nor was the retaliation claim like or reasonably related to Okoli's DFEH claim. (*Ibid.*)

Here, by contrast, the allegations in the DFEH complaint clearly foreshadow the discrimination and retaliation claims based on the transfer to Meadowview. Although the

18

transfer was completed after the filing of the DFEH complaint, the process for effectuating the transfer was well underway at the time of the filing and the DFEH complaint obviously refers to that process in alleging that Brown was "Denied *or forced to transfer.*"  (Italics added.)  The allegations in the DFEH complaint are " 'like and reasonably related to' " (*Wills, supra,* 195 Cal.App.4th at p. 154) the discrimination and retaliation claims based on the transfer to Meadowview, and we would expect an investigation into the former to uncover the facts giving rise to the latter.  (*Okoli, supra,* 36 Cal.App.4th at p. 1617.)

Although the allegations regarding the not-yet-implemented transfer were understandably thin, the purpose of a DFEH complaint is to trigger the investigatory and conciliatory procedures of the DFEH, not to limit a person's access to the courts. (*Saavedra v. Orange County Consolidated Transportation Agency* (1992) 11 Cal.App.4th 824, 827.)  The words of a DFEH complaint " ' "need not presage with literary exactitude the judicial pleadings which may follow." ' "  (*Nazir v. United Airlines, Inc., supra,* 178 Cal.App.4th at p. 267.)  Brown's DFEH complaint clearly alleged that he suffered discrimination and retaliation in connection with an unwelcome transfer, and was sufficient, without further elaboration, to exhaust administrative remedies as to that issue. The trial court properly denied the City's motion for judgment notwithstanding the verdict with respect to the transfer to Meadowview.

B.      *Motion for a New Trial*

Finally, the City argues the trial court should have ordered a new trial on the basis of irregularities in the proceedings.  Specifically, the City argues a new trial was warranted on the ground of juror misconduct, and on the ground that the jury should not have been allowed to hear evidence of the suspensions and transfer to Meadowview. We have already considered and rejected the second asserted ground for a new trial, which rests on the contentions that the claims based on the suspensions are time-barred

19

and the claims based on the transfer to Meadowview are unexhausted.[12]  We therefore turn our attention to the City's contention that a new trial was warranted on the ground of juror misconduct.

Juror misconduct is a ground for granting a new trial.  (Code Civ. Proc., § 657, subd. 2.)  "One form of juror misconduct is a juror's concealment of relevant facts or giving of false answers during a voir dire examination."  (*Ovando v. County of Los Angeles* (2008) 159 Cal.App.4th 42, 57; see *In re Manriquez* (2018) 5 Cal.5th 785, 797 [" 'A juror who conceals relevant facts or gives false answers during the voir dire examination . . . undermines the jury selection process and commits misconduct' "].)

When evaluating a motion for a new trial based on juror misconduct, the trial court must undertake a three-step process.  First, the court must determine whether the affidavits in support of the motion are admissible.  (Evid. Code, § 1150; *Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 345.)  Second, if the evidence is admissible, the court must then determine whether the facts establish misconduct.  (*Barboni, supra,* at p. 345.)  Finally, assuming misconduct occurred, the trial court must determine whether the misconduct was prejudicial.  (*Ibid.*; *Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 160 (*Whitlock*).)

Juror misconduct raises a rebuttable presumption of prejudice.  (*Whitlock*, *supra*, 160 Cal.App.4th at p. 162.)  The presumption may be rebutted by " 'an affirmative

---

[12] We have rejected the City's contention that Brown's claims arising from the suspension for the dumping incident and the transfer to Meadowview are time-barred and barred for failure to exhaust administrative remedies.  It follows that evidence concerning these incidents was properly admitted.  We have not considered whether Brown's claim arising from the suspension for alteration of the jury service form was time-barred, as the jury rejected that claim.  The City does not appear to argue that evidence concerning the suspension for alteration of the jury service form was independently prejudicial, in spite of the jury's verdict.  To the extent the City intends to make such an argument, we reject it.

20

evidentiary showing that prejudice does not exist' " based on such factors as " 'the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued.' " (*McDonald v. Southern Pacific Transportation Co.* (1999) 71 Cal.App.4th 256, 265.) It may also be rebutted by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party. (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 417.)

In determining whether juror misconduct occurred, we accept the trial court's credibility findings and findings of historical facts if supported by substantial evidence. (*People v. Majors* (1998) 18 Cal.4th 385, 417.) The determination of whether "those facts constitute [juror] misconduct [is] a legal question we review independently." (*People v. Collins* (2010) 49 Cal.4th 175, 242; see *People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1043.) " 'Whether prejudice arose from juror misconduct . . . is a mixed question of law and fact subject to an appellate court's independent determination.' " (*People v. Danks* (2004) 32 Cal.4th 269, 303.)

The City's motion for a new trial was supported by the declaration of its trial counsel, Maddox. Maddox averred that he asked a number of questions during voir dire which should have prompted Juror No. 2 to disclose the fact that she had previously served as lead plaintiff in a putative class action against an employer. Brown's trial counsel responded with a declaration averring that he had no recollection of the specific questions posed by Maddox, but many of them were "compound" and "confusing." The trial court specifically remembered the questioning on voir dire and agreed that Maddox asked questions that should have elicited an affirmative response from Juror No. 2. The trial court also remembered that Juror No. 2 had been notably enthusiastic towards Brown, responding to the opening argument of Brown's trial counsel with vigorous head nods and other body language indicating that she was favorably disposed towards Brown from the outset. We accept the trial court's resolution of the facts, which establishes

21

juror misconduct and raises a rebuttable presumption of prejudice.[13] (See *Whitlock, supra,* 160 Cal.App.4th at p. 160 ["it is the trial court that must assess the credibility of affiants or declarants, and the trial court is entitled to believe one over the other"].)

"Once juror misconduct is established, a *presumption* of prejudice arises. [Citation.] This presumption may be rebutted only by 'an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct.' " (*Glage v. Hawes Firearms Co.* (1990) 226 Cal.App.3d 314, 321 (*Glage*).) "Prejudice exists if it is reasonably probable that a result more favorable to the complaining party would have been achieved in the absence of the misconduct." (*Hasson v. Ford Motor Co., supra,* 32 Cal.3d at p. 415.)

The trial court considered two factors in concluding that the presumption of prejudice was overcome. First, the trial court considered the declarations of Juror No. 6 and Juror No. 12, both of whom averred that Juror No. 2 did not speak about her prior litigation experience. Second, the trial court considered the jury's voting tallies for each of the surviving claims. The trial court concluded that the presumption of prejudice was overcome with respect to all but the 9-3 vote (on the claim for retaliation based on the denial of promotion in 2014), as to which a new trial was conditionally ordered.

---

[13] We reject Brown's contention that the lack of a reporter's transcript of the voir dire proceedings prevents us from reviewing the juror misconduct issue. The parties stipulated that the court reporter need not transcribe the voir dire proceedings. Consequently, we do not have a transcript of the precise questions asked during voir dire. Nevertheless, we are satisfied that we have an adequate record to review the City's claim of error, which is directed solely to the trial court's determination that the presumption of prejudice was overcome. Although Brown questions the trial court's finding that Juror No. 2 committed juror misconduct, he has taken no cross-appeal on the issue, and we decline to review it.

22

The City argues the trial court's analysis was flawed in several respects. First, the City argues the trial court focused on the wrong voting tallies. Specifically, the City observes that the trial court focused on the voting tallies for the question of whether the challenged acts constituted adverse employment acts, rather than the voting tallies for the separate question whether the adverse employment acts were substantially motivated by race or retaliation. Second, and related, the City argues that the trial court appears to have miscounted the jury's votes.

Although some of the trial court's voting tallies may have been incorrect, the correct voting tallies do little to advance the City's cause. Even when the votes are adjusted and analyzed in the manner the City suggests, the jury still found for Brown on the liability questions relevant to the remaining discrimination and retaliation claims by votes of 12-0, 11-1, and 10-2. The only issue that was not decided by a 12-0, 11-1, or 10-2 vote was the claim for retaliation based on the denial of promotion in 2014, as to which the motion for judgment notwithstanding the verdict was granted. On this record, we conclude that any errors in calculating the voting tallies were harmless.

The City acknowledges that California courts have endorsed the practice of examining voting tallies in evaluating prejudice arising from juror misconduct. (See, e.g., *Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 110 [where "the verdict was nine to three, the disqualification for bias of any one of the majority jurors could have resulted in a different verdict"]; see also *Glage, supra,* 226 Cal.App.3d at pp. 321-322 [in civil cases, the presumption of prejudice resulting from juror misconduct may be rebutted where remaining jurors were sufficiently numerous to render a proper and fair verdict].) Despite these authorities, the City argues the trial court erroneously applied a "bright line rule," whereby the presumption of prejudice was deemed to have been rebutted based solely on the voting tallies, without regard to the seriousness of Juror No. 2's misconduct. Nothing in the record indicates that the trial court applied any such rule or ignored the magnitude of Juror No. 2's misconduct. Rather, the record indicates

23

the trial court considered the voting tallies in combination with the evidence concerning the nature and extent of Juror No. 2's misconduct, which included undisputed evidence that Juror No. 2 never discussed her prior litigation activity with other jurors. Based on our independent review of the record, we agree with the trial court's conclusion that the presumption of prejudice was rebutted.

Relying on *Dyer v. Calderon* (9th Cir. 1998) 151 F.3d 970, the City argues the trial court failed to appreciate the "destructive uncertainties" that even a single biased juror can introduce into the fact-finding process. *Dyer* is nonbinding and readily distinguishable. There, a juror in a capital murder case failed to respond to voir dire questions that would have revealed the fact that her brother had been murdered and her estranged husband was in jail on a rape charge. (*Id.* at pp. 972-973.) The federal appellate court was unable to find actual bias on the juror's part, but nevertheless presumed bias, inferring from the juror's dishonesty a desire to "preserve her status as a juror and to secure the right to pass on [the defendant's] sentence." (*Id.* at p. 982.) The court explained: "A juror . . . who lies materially and repeatedly in response to legitimate inquiries about her background introduces destructive uncertainties into the process. There is, of course, the possibility that she did so because of some personal bias against the defendant which she managed to hide from the court. But a perjured juror is unfit to serve even in the absence of such vindictive bias." (*Id.* at p. 983.) The federal appellate court concluded that the juror's presumed bias violated the defendant's right to a fair trial. (*Id.* at p. 973.)

Our Supreme Court has similarly held that the presence of one or more jurors who are actually biased against the defense amounts to structural error and compels reversal in criminal cases, regardless of prejudice. (*People v. Carter* (2005) 36 Cal.4th 1114, 1176; see also *People v. Pierce* (1979) 24 Cal.3d 199, 208 ["[b]ecause a defendant charged with crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced"].)

24

"A strict rule that one tainted juror compels reversal is necessary in criminal cases because under the California Constitution, the jury must unanimously agree that a defendant is guilty. [Citations.] The vote of one tainted juror obviously renders the required unanimous verdict unreliable. [¶] In civil cases, however, juror unanimity is not required. [Citation.] Rather, 'three-fourths of the jury may render a verdict.' [Citation.] Thus, the strict . . . rule regarding one tainted juror is neither necessary nor appropriate." (*Glage, supra,* 226 Cal.App.3d at p. 322, fn. omitted.)

Here, the City was entitled to a fair trial, but not a unanimous verdict. (*Glage, supra,* 226 Cal.App.3d at p. 322.) Although Juror No. 2's misconduct was undeniably serious, we cannot say that the City suffered prejudice. As we have suggested, the only aspect of the jury's verdict that could have been affected by Juror No. 2's vote was the retaliation claim based on the denial of promotion in 2014, as to which the motion for judgment notwithstanding the verdict was granted, and no appeal has been taken. On the record before us, where Juror No. 2 does not appear to have advocated for Brown and did not discuss the circumstances giving rise to her apparent bias with others, we are satisfied that the presumption of prejudice has been rebutted.

## III.  DISPOSITION

The judgment is affirmed.  Brown is awarded his costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

/S/

RENNER, J.

We concur:

/S/

BLEASE, Acting P. J.

/S/

MAURO, J.