Filed 10/30/20  WiFi Rail, Inc. v. S.F. Bay Area Rapid Transit Dist. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| WIFI RAIL, INC.,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT,<br><br>     Defendant and Respondent. | A157568<br><br>(Alameda County<br>Super. Ct. No. RG16809176) |

Plaintiff WiFi Rail, Inc. (WiFi Rail) entered into a license agreement with defendant San Francisco Bay Area Rapid Transit District (BART) whereby WiFi Rail agreed to install, operate, use, replace, modify and maintain a commercial wireless internet network for the BART system.  WiFi Rail contends that BART breached this license agreement by terminating WiFi Rail without proper notice and an opportunity to cure.

A jury found that WiFi Rail did not do all, or substantially all, of the significant things that the license agreement required it to do, and, as it was instructed, it answered no further questions on the special verdict form.  The trial court entered judgment for BART on the jury's verdict, and this appeal involves only the denial by operation of law of WiFi Rail's motion for judgment notwithstanding the verdict (JNOV) on its breach of contract claim. As it did below, WiFi Rail seeks to overturn the judgment for a new judgment

1

entirely in its favor with a new trial for damages only. Because there is a contested issue of fact as to whether BART's alleged breach caused WiFi Rail harm, WiFi Rail is not entitled to the JNOV that it seeks. We shall affirm the order denying JNOV by operation of law.

**FACTUAL AND PROCEDURAL BACKGROUND**

WiFi Rail incorporated in 2006 with the goal of enabling cellular and internet service on public rail transportation. In 2006, the CEO of WiFi Rail, Cooper Lee, contacted BART to see if BART was willing to allow WiFi Rail to test its concept. BART was a particularly attractive target for Lee because BART maintained a live-train test track in Hayward. Chuck Rae, BART's then Telecommunications Revenue Manager, responded to Lee, and BART allowed WiFi Rail to utilize its test facility to conduct research and development. WiFi Rail conducted its research at BART's Hayward test track and in BART's downtown San Francisco stations and track.

### *The License Agreement*

WiFi Rail and BART entered into a WIFI License Agreement (the Agreement) on December 15, 2008 for WiFi Rail to provide wireless internet (wifi) service in contractually-designated coverage areas, including all BART passenger rail cars operating on the BART right-of-way, all publicly accessible areas inside the fare gates of all above-ground BART stations, and all publicly accessible areas of BART underground stations, whether inside or outside the fare gates, and including platforms, mezzanines and public corridors, but excluding low-traffic areas identified during the BART design review process. BART granted WiFi Rail a license to install, operate, and use equipment and facilities on the BART System. With limited exceptions for use of existing BART structures and equipment set forth in the Agreement, the Agreement required WiFi Rail to supply and install the all components of

2

the "Wifi Infrastructure" at its sole expense, "including but not limited to (i) all fiber optic cable; (ii) all towers, antennas, insertion couplers, electronics, power supplies and other equipment; (iii) all in-car components; (iv) all internet bandwidth and connectivity; and (iv) all utility connections" (the wifi infrastructure).

The Agreement contains a schedule for installation of the wifi infrastructure in five phases: Phase 1 (four stations); Phase 2 (nine stations); Phase 3 (thirteen stations); Phase 4 (thirteen stations); and Phase 5 (six stations). WiFi Rail was to provide wifi in BART stations and cars that would commence, with respect to the required coverage areas located in each phase, upon the completion of each phase and that would continue thereafter during the remaining term of the Agreement. WiFi Rail was required to provide wifi service that would "always equal or exceed the performance provided by leading industry service providers."

The Agreement provides that the details of the wifi infrastructure and its installation schedule shall be determined during the BART Design Approval Process. The Agreement does not contain a fixed time for performance, but states that an installation schedule would be established during BART's design review process. The Agreement provides that the installation schedule would target completion of the entire wifi infrastructure within 24 months after BART's design review process approval for Phases 1 and 2. The Agreement also states that time was of the essence.

WiFi Rail was entitled to recoup its payment for construction costs by selling advertising and charging passengers for wifi service after completion of Phase 2. Upon BART's certification of substantial completion for Phase 2, WiFi Rail would owe BART a license fee, and the Agreement sets forth a

3

license fee schedule of $40,000 per station starting in 2009, with a 3.5 percent increase per year thereafter starting January 1, 2010.

The term of the Agreement was from December 18, 2008 to December 31, 2019. Upon the occurrence of "an event of default," the Agreement provides that "each party shall have all rights and remedies specified herein or available at law or in equity," and "[e]ither party shall have the right to terminate this Agreement if an event of default by the other party exists." As relevant here, the Agreement defined the following as an "Event of Default": "[I]f WiFi Rail materially fails to perform any other covenant [besides payment of fees set forth in subsections (i) and (ii)] in this Agreement within thirty (30) days after written notice from BART specifying the failure; provided, that if such failure cannot, with due diligence be cured within a period of thirty (30) days, WiFi Rail shall not be deemed to be in default if WiFi Rail begins to cure the failure within such thirty (30) day period and thereafter diligently prosecutes such cure to completion."

Section 20.2, entitled "Notices," states: "All notices under this Agreement shall be in writing and shall be deemed validly given if sent by courier, overnight mail, facsimile transmission or regular certified mail, return receipt requested, and shall be effective upon receipt." This section also provides that notices "should be" addressed to the recipients for each party noted therein.

***The Project***

BART issued a construction permit to WiFi Rail in January 2009, which, pursuant to the Agreement, evidenced its approval of WiFi Rail's plans and engineering drawings. Sometime thereafter, the parties entered into an agreement for a separate test project wherein WiFi Rail would install

4

and test a "proof-of-concept" video surveillance network in train cars for the BART police.[1]

In the second half of 2010, Lee wrote to WiFi Rail shareholders to explain why he had secured proxy votes to replace the Board of Directors. In this letter, he stated that the company had ceased focusing on the project with BART in 2010, and it had all but stopped work on Phase 2. He wrote that senior management had "diluted [WiFi Rail's] limited resources in pursuit of potential opportunities in other sectors of the transportation industry," and nearly all of the company's money had been spent on executive compensation and travel expenses for fundraising and pursuit of other opportunities. Lee informed shareholders that, while future opportunities may be important, WiFi Rail's business was in its very early stages and capital remained "very difficult to raise." Thus, the company needed to "re-commit itself to completing what is at hand in lieu of assuming additional commitments." Lee informed shareholders that WiFi Rail had an available bank balance of under $10,000 and needed to raise additional funds to complete Phase 2.

James Kearns, WiFi Rail's project manager for development of the commercial wifi infrastructure, testified that, by the end of 2011, WiFi Rail had finished much of Phase 2 but had work to do on the installation of certain equipment on a freeway wall between the Glen Park and Balboa Park stations. He further testified that, in late October 2011, Rae instructed WiFi

---

[1] The public commercial wifi network that was the subject of the Agreement is often referred to in the record as "2.4" or "2.4 GHz," and the safety and security network for use by BART police as "4.9" or "4.9 GHz." These numbers represent the channel assigned by the Federal Communications Commission for each network. The purpose of the "proof-of-concept" security system trial was for WiFi Rail to prove that it could provide live video from the train cars with 4.9GHz equipment.

Rail not to finish the last item of work under Phase 2—installing equipment on the freeway wall between Glen Park and Balboa Park—and to instead focus on installing devices that carried video for the security system in BART cars. WiFi Rail never presented BART with certificates that installation of the wifi infrastructure was substantially completed and ready for commercial operation for Phase 1 or Phase 2.

In September 2012, Rae wrote to WiFi Rail regarding its "failure to meet its contractual obligations" by "fail[ing] to build-out the 2.4 system" due to "[WiFi Rail's] lack of financial resources." Rae wrote that he had "repeatedly warned [Lee] about [WiFi Rail's] failure to build-out the 2.4 system," it was past time for WiFi Rail to "step up to the plate," and BART was very concerned with the status of the project.[2] He noted that "[t]ime is very short," and that, absent progress, BART would be forced to consider alternatives.

Lee responded days later telling BART that he "believe[d] [Phase 3 roll out and design] will take between 14 and 16 months to complete the wayside and on-car installations with a cost of roughly $9M." At trial, Lee conceded that, at the time, he did not deny Rae's statements regarding the delay or that the delay was the result of WiFi Rail's chronic financial problems; he instead ignored the statements. As of December 31, 2012, WiFi Rail had $18,475.16 available in its bank accounts. On October 11, 2012, Rae wrote Lee again, advising him that "[e]nsuring the timely completion of the 2.4 system is BART's primary objective," and, "[t]he delays in the 2.4 project have become a major concern to BART management."

In January 2013, Lee wrote to inform BART that WiFi Rail had secured funding to proceed with Phase 3, but WiFi Rail required modification of the

---

[2] Rae passed away in 2013, so he did not testify at trial.

Agreement "to lower the station rental fees to a level that will work commercially or agree to a gross profit sharing arrangement." Lee suggested $5,000 per annum per station, but stressed that this figure depended on the commercial value derived from the users of the wifi services. He also proposed reexamination of the Agreement's provision that wifi access to users in the first four downtown San Francisco stations remain free and certain details about costs associated with the construction. Lee admitted at trial that WiFi Rail sought a contract modification reducing the license fee owed to BART from $40,000 to $5,000 per station because that was what it could make work commercially. No such modification occurred, and Lee admitted that he told BART he was not sure that the project would be feasible even with a reduction to $5,000.

Thereafter, and for an extended period of time, the parties attempted to negotiate an Amendment No. 1 to the Agreement. Communications regarding this amendment show the amendment contemplated that WiFi Rail would first design and install the infrastructure facilities at the BART stations in Phase 3 and then would install the infrastructure to provide wifi coverage along the trackways between the stations.

In February 2014, counsel for BART, Jay Powell, emailed a letter to counsel for WiFi Rail, noting that, notwithstanding the lack of execution of Amendment No. 1, BART had cooperated with WiFi Rail's engineering team to permit them to design an installation plan for Phase 3. Powell outlined a process whereby BART's design review for Phase 3 would proceed in two stages: The first stage would deal with design and installation of infrastructure facilities at BART stations, and the second stage would address design and installation of infrastructure to provide coverage along the trackways. Powell attached a proposed Amendment No. 1 that he stated

7

the parties must sign before WiFi Rail commenced work on Phase 3. The Agreement required modifications to be in writing, but the parties did not execute Amendment No. 1.

WiFi Rail applied for a Phase 3 permit in the spring of 2014.

On July 31, 2014, BART's new in-house counsel, Phyllis Whitten, emailed a letter to counsel for WiFi Rail. Whitten stated that WiFi Rail must provide: 1) an installation schedule including milestones for the design and submission of plans for the installation of the wifi infrastructure along the trackways between stations for Phase 3; 2) a schedule and plan for WiFi Rail's commencement and completion of an assessment of its economic model for the project; and 3) written information that would give BART reasonable assurance that WiFi Rail had the necessary financial resources to complete both stages of Phase 3.

By mid-2014, Lee informed BART's Assistant Chief Technology Officer, Travis Engstrom, that WiFi Rail was out of money to build the network. In a meeting in September 2014, Engstrom testified that Lee "confessed to us that he did not have the ability to move forward. He did not have an investor. He did not have his own money to continue." Engstrom testified that, Lee, with tears welling in his eyes, offered to install anything BART wanted if BART would pay WiFi Rail $110,000 a month.

On September 9, 2014, Whitten again sent a letter to WiFi Rail's counsel by email. She stated that BART's objective was to obtain a working commercial wifi network in a timely manner, and she reiterated that BART had not received the information that it requested in its July 2014 letter. She further noted WiFi Rail's failure to provide the requested design milestones for the wifi infrastructure and requested that this information be provided within ten business days. Whitten wrote that WiFi Rail "has not been

relieved by BART of any obligations to design, fund and install the necessary infrastructure." She requested that WiFi Rail provide a report on the status of completion of Phases 1 and 2 of the wifi infrastructure within ten business days, noting that the Agreement provides "that [WiFi Rail] will seek from BART a written certificate of substantial completion prior to commencing commercial operations, and pay certain license fees to BART." Whitten also wrote that it appeared that WiFi rail had never sought to confirm completion of the first two phases, and it had not paid any license fees to BART in connection with these phases.

On October 10, 2014, Whitten emailed another letter to WiFi Rail's counsel. In this letter, BART informed WiFi Rail that it had failed to provide information requested about its business model and its financial resources to complete the project. It further stated that BART had asked for, but had not received, details from WiFi Rail regarding how the project in Phase 3 would proceed past the first step to reach timely completion. BART also stated that Phases 1 and 2 of the project were not complete, testing in cooperation with WiFi Rail established that WiFi Rail was not providing adequate service to BART riders, and no license fees had been paid. Because of what it considered to be WiFi Rail's inability to secure financing for over six years and the resulting incompletion of the project, BART proposed that the parties agree to mutually terminate the Agreement.

On November 5, 2014, Whitten emailed a letter to WiFi Rail's counsel stating that BART was supplementing its October 10, 2014 letter as it had not received any response. The November letter stated that, as BART previously indicated, with the cooperation of WiFi Rail and an outside testing firm, BART tested WiFi Rail's service as installed in Phases 1 and 2. "The test results, included as a PDF attachment to the same email that transmits

9

this letter, show that Wi-Fi service with unacceptable data connectivity loss is being provided to BART riders." BART concluded, "Under the circumstances, BART concludes that [WiFi Rail] has failed to provide a fully functional Wi-Fi system and has failed to demonstrate that it is capable of doing so. Accordingly, we hereby terminate the 2008 Wi-Fi License Agreement (License Agreement) for provision of commercial wireless services on BART premises."

*The Lawsuit*

WiFi Rail sued BART for breach of contract, breach of the implied covenant of good faith and fair dealing, and conversion.

A 13-day jury trial was held.[3] The trial court directed a verdict for BART on WiFi Rail's conversion claim, and the court denied WiFi Rail's motion for directed verdict on its other two claims. The jury returned a unanimous special verdict in BART's favor. The special verdict addressed only the first element of WiFi Rail's two causes of action—did WiFi Rail do all, or substantially all, of the significant things required of it by the parties' contract? Because the jury answered that question in the negative, it did not address anything else, including whether BART breached the Agreement or whether WiFi Rail was harmed by BART's alleged breach. The trial court entered judgment in BART's favor on February 7, 2019, and BART served WiFi Rail with a Notice of Entry of Judgment on February 14, 2019.

On February 20, 2019, WiFi Rail filed its motion for JNOV, with a hearing scheduled for May 9, 2019. In its JNOV motion, WiFi Rail requested that the trial court "direct a verdict on liability in favor of [WiFi] Rail and

---

[3] WiFi Rail's briefing describes a number of the trial court's pretrial rulings. We do not discuss these rulings because we have dismissed WiFi Rail's appeal from the judgment.

10

require a new trial on damages only," and it submitted a proposed order with language ordering "that the judgment entered herein on February, 7, 2019 be vacated, and that judgment be entered in favor of Plaintiff [WiFi] Rail, Inc." WiFi Rail also filed a motion for a new trial, with a hearing scheduled for May 14, 2019. In May 2019, the trial court called the motions and confirmed that its jurisdiction to hear both had expired and the motions were denied by operation of law.

On June 7, 2019, WiFi Rail appealed from the judgment and the denial of the motions for new trial and JNOV. This court granted BART's motion to dismiss WiFi Rail's appeals of the judgment and the order denying its motion for a new trial because they were untimely, but found the appeal from the denial of the motion for JNOV to be timely.

## DISCUSSION

A. Standard for Review for Judgment Notwithstanding the Verdict

A trial court shall render judgment notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted. (Code Civ. Proc., § 629, subd. (a).) "A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.)

On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. (*Sweatman, supra*, 25 Cal.4th at p. 68.) In reviewing a trial court's denial of a judgment notwithstanding the verdict motion, we consider the evidence in the light most favorable to the prevailing party and indulge in all legitimate and

11

reasonable inferences to uphold the verdict. (*Casella v. SouthWest Dealer Services, Inc.* (2007) 157 Cal.App.4th 1127, 1144.) If there is any substantial evidence, we must affirm the denial of the motion. (*Sweatman*, at p. 68.) "However, to the extent a motion for judgment notwithstanding the verdict raises legal issues such as the application of law to undisputed facts or the interpretation of a statute or contract, we review the trial court's ruling on the motion de novo." (*Brown v. City of Sacramento* (2019) 37 Cal.App.5th 587, 598.)

B. Analysis

WiFi Rail's cause of action for breach of contract is the only cause of action at issue in this appeal. The elements of this cause of action are: the contract; plaintiff's performance or excuse for nonperformance; defendant's breach; and the resulting damages to plaintiff. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) To establish a breach of contract claim, the plaintiff must prove causation—that defendant's conduct was a substantial factor in causing the plaintiff's harm. (*Haley v. Casa Del Rey Homeowners Assn.* (2007) 153 Cal.App.4th 863, 871–872.)

The parties spend many pages of their briefing disputing whether BART provided proper notice of default before terminating the Agreement with letters that WiFi Rail contends were sent by improper means and failed to adequately specify the defaults at issue. We do not reach this issue because WiFi Rail's request that we reverse the denial of JNOV founders on another point: Even assuming BART failed to provide proper notice before termination and thereby breached the Agreement, WiFi Rail would only be entitled to the remedy it seeks—entry of a verdict in its favor on its breach of contract claim and a new trial on damages only—if the evidence indisputably established the element of causation. WiFi Rail ignores causation, and we

12

agree with BART that a disputed question of fact exists regarding whether BART's termination caused WiFi Rail any harm. WiFi Rail thus is not entitled to reversal of the denial of its JNOV motion and entry of judgment in its favor on its breach of contract claim.

With limited exceptions for use of existing BART structures and equipment, the Agreement required WiFi Rail to supply and install the components of the wifi infrastructure at its sole expense, and WiFi Rail agreed to install, operate, use, replace, modify, and maintain the wifi infrastructure. In 2008, WiFi Rail estimated that it would take close to $20 million to build the wifi infrastructure. In 2009, WiFi Rail estimated that completion of phase 2 would cost $4 million, and completion of phases 3 through 5 would cost $15 million. Mr. Lee admitted that no investment company ever provided WiFi with this $19 million in investment capital. WiFi Rail's original business plan was to become profitable and cash-flow positive by the end of the second year of deployment, but Lee admitted that did not happen.

Sometime in the second half of 2010, Lee wrote to WiFi Rail shareholders stating that the company had ceased focusing on the project with BART in much of 2010, and it had all but stopped work on Phase 2. Senior management had "diluted [WiFi Rail's] limited resources in pursuit of potential opportunities in other sectors of the transportation industry," and nearly all of the company's money had been spent on executive compensation and travel expenses for fundraising and pursuit of other opportunities. Lee informed shareholders that capital remained "very difficult to raise," WiFi Rail had an available bank balance of under $10,000, and it needed to raise additional funds to recommit to and complete Phase 2.

13

In 2013, Lee requested an amendment to the Agreement to lower the per station license fee from $40,000 to $5,000 as the $5,000 figure was what WiFi Rail thought it could make work commercially.

By mid-2014, Lee had informed BART that WiFi Rail was out of money to build the network. In a meeting in September 2014, Engstrom testified that Lee, "confessed to us that he did not have the ability to move forward. He did not have an investor. He did not have his own money to continue." Lee offered to install anything BART wanted if BART would pay WiFi Rail $110,000 monthly for services. Lee tried to explain his request through his testimony that there was newer 802.11 technology at the time than the 802.11g equipment deployed in Phases 2, BART had requested a technology refresh of the deployed equipment, and Lee said that WiFi Rail would do the technology refresh if BART paid for it because WiFi Rail did not plan to do the refresh until after Phase 3.[4] However, the Agreement stated that, "WiFi Rail shall upgrade the equipment used in the Wi-Fi Infrastructure from time to time as may be necessary to meet the performance specifications or to provide support for new Wi-Fi protocols (such a 802.11(n)) as they achieve an appropriate level of commercial acceptance and use." (§ 6.1(c).) Lee testified that the newer 802.11n technology was available, WiFi Rail had deployed this 802.11n technology in a project it worked on in England, and it planned to deploy this technology with Phase 3. After the September 2014 meeting,

---

[4] 802.11 is an engineering standard for the manufacturing of equipment for wireless Ethernet. Over the years, there have been various iterations of 802.11, starting with 802.11a in the late 1990s and spanning many iterations since then, such as 802.11g, 802.11h, and 802.11n. These protocols are backwards and forwards compatible, so as the manufacturers made better and better devices, the older devices would still work with the newer devices.

WiFi Rail never contacted BART to inform BART that WiFi Rail had secured funding to move forward with the project.

Based on the foregoing evidence, a jury could reasonably conclude that any alleged failure by BART to provide proper notice of default before terminating the Agreement did not cause WiFi Rail harm because WiFi Rail simply did not have the financial resources to perform. WiFi Rail is thus not entitled to a directed verdict on liability, which (along with a new trial on damages only) is the sole remedy it requested.

## C. Evidence Exclusion and Instructional Error

WiFi Rail argues that the trial court erred in failing to give a special jury instruction modifying CACI 321 relating to the existence and occurrence of a condition precedent, which the trial court found inverted the burden of proof, and in excluding certain communications from WiFi Rail's counsel to BART's counsel. Because these arguments were not raised in the JNOV motion below, BART contends that they cannot be raised on appeal, and WiFi Rail does not respond to BART's forfeiture argument. We find these issues forfeited because WiFi Rail failed to raise them in its JNOV motion below and also because WiFi Rail did not timely appeal from the judgment or from the denial of its motion for a new trial. (*Lee v. West Kern Water Dist.* (2016) 5 Cal.App.5th 606, 634–635 [it is improper to raise arguments on appeal that were not raised in the post-trial motion being challenged on appeal]; *Sanchez v. Brooke* (2012) 204 Cal.App.4th 126, 136–137 [appellant forfeited an instructional error challenge by not appealing the judgment and appealing only the denial of judgment notwithstanding the verdict].)

## DISPOSITION

The order denying JNOV is affirmed.

_____
BROWN, J.

WE CONCUR:


_____
POLLAK, P. J.


_____
TUCHER, J.

*Wifi Rail, Inc. v. San Francisco Bay Area Rapid Transit District* (A157568)

16