Filed 11/28/22 Pesic Zouves Fertility Center CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| KATHERINE PESIC,<br><br>　　Plaintiff and Appellant,<br><br>　　v.<br><br>ZOUVES FERTILITY CENTER et al.,<br><br>　　Defendants and Appellants. | H047915<br>(Santa Clara County<br>Super. Ct. No. 2014-1-CV-271935) |
| KATHERINE PESIC,<br><br>　　Plaintiff and Appellant,<br><br>　　v.<br><br>ZOUVES FERTILITY CENTER et al.,<br><br>　　Defendants and Respondents. | H048180<br>(Santa Clara County<br>Super. Ct. No. 2014-1-CV-271935) |

Ivan Pesic died in October 2012, leaving all of his property to his wife of 33 years, Katherine (Kathy).[1]  Shortly after Ivan's death, Kathy received a creditors' claim for child support from Joyce Chin, an accountant at Silvaco, the software company Ivan and Kathy had founded.

---

[1] For clarity, we refer to Ivan Pesic and Kathy Pesic by their first names.

Unbeknownst to Kathy, Ivan had been engaged in a long-term extramarital affair with Chin—they already had a six-year-old child and Chin was pregnant with twins conceived after Ivan's death via in-vitro fertilization (IVF) using Ivan's frozen sperm.

For roughly two years before Ivan's death, he and Chin had been visiting Dr. Cristo Zouves and the Zouves Fertility Center in Foster City. In February 2011, Ivan banked his sperm with Zouves prior to beginning chemotherapy for stage IV colon cancer. In connection with that, Ivan and Chin entered into a cryopreservation agreement with Zouves governing the storage and use of his frozen sperm.

The interpretation of that agreement is the principal dispute in these coordinated appeals. Among other things, the agreement provided an initial one-year storage period for the frozen sperm and specified that, "[a]t the end of the designated storage period, this Agreement with the ZFC Center for continued cryopreservation of the semen must be renewed, otherwise **the failure to renew the contract will result in the semen being thawed and discarded.**"[2]

The agreement also provided various options for what to do with the frozen sperm in the event Ivan or Chin were to die during the storage period. Ivan and Chin selected the option giving her the right—in the event of Ivan's death during the storage period and upon presentation of a certified copy of the death certificate—to choose whether to have the frozen sperm discarded or to use it for IVF.

Although Ivan and Chin never paid to renew the agreement, they continued visiting Zouves for IVF treatment, which proved unsuccessful before Ivan died.

In October 2012, just days after Ivan died, Chin visited Zouves with new consent forms—purportedly signed and dated by Ivan after his death—for a subsequent IVF cycle using a donor egg. Chin did not provide a certified copy of the death certificate or inform

---

[2] Bold text appears in the cryopreservation agreement itself.

Zouves that Ivan had died; nevertheless, Zouves thawed and used Ivan's frozen sperm. The IVF procedure worked and Chin eventually gave birth to the twins.

In 2014, Kathy sued Zouves for conversion and other causes of action. For the conversion claim—the only one at issue here—Kathy alleged that she owned Ivan's frozen sperm following his death, Zouves substantially interfered with her property rights by using the sperm, and Kathy had expended substantial sums of money as a result, primarily in defending against Chin's claims.

The jury found in Kathy's favor and awarded her over $800,000 in damages.

Zouves filed motions for judgment notwithstanding the verdict (JNOV) and for a new trial as to liability and damages, arguing that the cryopreservation agreement unambiguously gave Zouves the right to use Ivan's frozen sperm as it did and the trial court should have instructed the jury accordingly, and that substantial evidence did not support the damages award because the attorney fee billing records Kathy submitted lacked foundation.

The trial court agreed and granted both motions.

On appeal, Kathy argues that the cryopreservation agreement unambiguously did *not* give Zouves the right to use the frozen sperm and that the jury's findings were supported by substantial evidence; accordingly, JNOV was improper and the trial court abused its discretion granting the motion for new trial as to liability and damages.

Zouves filed a protective cross-appeal, arguing that (1) the trial court improperly denied the part of its motion for JNOV which argued that Kathy did not own Ivan's frozen sperm at the time Zouves used it and (2) portions of the jury's damages award were not supported by substantial evidence.

We agree with Kathy and hold that the cryopreservation agreement unambiguously provided that the storage period ended after one year if the agreement was not renewed and that Zouves did not have the right to use Ivan's frozen sperm after his death without presentation of a certified copy of the death certificate.

3

Substantial evidence supports the jury's verdict as to liability, so we reverse the JNOV and reject Zouves's cross-appeal.

Because the trial court based its order granting Zouves's motion for new trial as to liability on a different interpretation of the cryopreservation agreement, we reverse that as well. However, we determine the trial court did not abuse its discretion granting the motion for new trial as to damages, so we remand with directions to enter a new order granting a new trial as to damages only.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual background

Ivan and Kathy Pesic married in 1979. In 1984, they founded Silvaco, Inc., a software company in Santa Clara. Ivan was the CEO from the company's inception until his death in 2012. Kathy performed various tasks for Silvaco while she also worked a separate full-time job.

Joyce Chin worked for Silvaco as an accountant between 1995 and 2013. She and Ivan began an affair in 2004. In 2006, Chin gave birth to their first child. Chin and Ivan wanted more children but had trouble conceiving naturally.[3]

In November 2010, presenting themselves as a married couple, Chin and Ivan began visiting the Zouves Fertility Center (ZFC) in Foster City in hopes of having another child via IVF. Dr. Cristo Zouves, a reproductive endocrinologist, founded ZFC in 1999 and is its sole owner.[4]

---

[3] Kathy testified that she did not learn about Ivan's affair with Chin or their children until after Ivan's death.

[4] We refer to ZFC and Dr. Zouves collectively as "Zouves," unless otherwise indicated. The parties agreed that, "at all times relevant to Ms. Pesic's claims, the actions by Dr. Zouves were done on behalf of ZFC and the actions taken by any employees of ZFC, regarding the care and treatment of Ms. Chin and Mr. Pesic, were done on behalf of ZFC and Dr. Zouves."

4

Standard pre-IVF blood tests for Ivan revealed abnormalities that eventually resulted in a diagnosis of stage IV colon cancer. Ivan started chemotherapy in February 2011. Because chemotherapy can adversely affect sperm, and because Ivan's sperm count was low to begin with, Dr. Zouves recommended that Ivan bank sperm samples for use "down the road" in the event his sperm further deteriorated or disappeared.

### 1. Cryopreservation agreement

Chin and Ivan signed an "Informed Consent and Agreement for Longterm Cryopreservation and Storage of Semen" with Zouves on February 5, 2011 (cryopreservation agreement or agreement). Two sections of the cryopreservation agreement are particularly relevant here. Section 2 set forth the general procedures for the cryopreservation and terms for the length of the storage period. It provided: "The Partners consent to the following procedure for cryopreservation (freezing) of the Male Partner's semen: [¶] a. The Male Partner will produce one or more samples of his semen which may then be cryopreserved (frozen). . . . The semen shall be stored frozen for the exclusive use by the Partners [Ivan and Chin] for the future fertilization of the Female Partner's Eggs, or in some cases a Donor's Eggs, unless the Partners otherwise direct the Physician in this Agreement or in a separate written agreement."

With respect to the storage period, section 2 provided: "b. All fees . . . shall be paid in advance in accordance with the ZFC Center's fee schedule. [¶] c. The Female Partner and the Male Partner agree that the payment of the storage fee is for the specific period of time, as follows: 1 YEAR (12) months[.] [¶] d. At the end of the designated storage period, this Agreement with the ZFC Center for continued cryopreservation of the semen must be renewed, otherwise **the failure to renew the contract will result in the semen being thawed and discarded.** The number of renewals is unlimited. If this Agreement for cryopreservation is not renewed, the ZFC Center shall have the authority to discard the semen without prior authorization from the Partners or if they are not living from their executors, administrators, trustees, successors, assigns or heirs. The ZFC

5

Center has no obligation to notify the Partners that this Agreement is to expire or that it must be renewed. It is the obligation of the Partners to make sure that the storage fee is paid prior to the expiration of the designated storage period."

Section 3 of the agreement provided options for the partners to indicate how they wanted the frozen semen to be used in the event one of the partners should die during the storage period. It provided: "If at any time during the storage period either partner should die, the surviving partner shall provide the undersigned physician(s) and the ZFC Center with a certified copy of the death certificate. At that time the surviving Partner shall advise the ZFC Center of the following (select only those which apply): [¶] a. All semen shall be thawed and discarded. (If this is the Partners' selection, then answers are not required to b or c)[.] [¶] b. If the Female Partner is the surviving partner, then the Female Partner and the Male Partner agree as follows and instruct the Physician and the ZFC Center to do the following: [¶] (1) The Female Partner shall have the right to either have the semen thawed and used for *in vitro* fertilization of the Female Partner's Eggs, or for *in vitro* fertilization of a Donor's Eggs, and to have the resulting embryos transferred either to the Female Partner's uterus or the uterus of a surrogate, or the Female Partner shall have the right to have the semen discarded. [¶] (2) The Female Partner shall **not** have the right to either have the semen thawed and used for *in vitro* fertilization of the Female Partner's Eggs or for *in vitro* fertilization of a Donor's Eggs, and to have the resulting embryos transferred to the Female Partner's uterus or the uterus of a surrogate."

At the time they signed the cryopreservation agreement, Chin and Ivan selected option (1) by initialing in the space provided. Ivan's semen was subsequently frozen on February 6, 9, 11, 13, and 16, and September 19, 2011.[5]

---

[5] The record also reflects that Ivan banked semen on December 21, 2010, before signing the cryopreservation agreement.

Chin and Ivan never paid to renew the cryopreservation agreement after the one-year period expired on February 6, 2012. As discussed further below, Zouves contends that, despite that fact, the cryopreservation agreement never expired.

### 2. IVF consent forms and embryo cryopreservation agreements

Between November 2010 and June 2012, Chin and Ivan underwent six unsuccessful IVF cycles using Chin's eggs. For each such cycle, the couple was required by Zouves to sign two separate forms: an "Informed Consent to Perform Conventional *In Vitro* Fertilization and Embryo Transfer" (IVF consent form) and an "Informed Consent and Agreement for Cryopreservation of Embryo(s) for One Year Period After Ovum Retrieval" (embryo agreement). In accordance with that requirement, Chin and Ivan signed the two agreements on each of the six occasions they visited ZFC together for an IVF cycle.

Among other things, the IVF consent forms set forth the medical procedures for extracting the eggs from the female and the sperm from the male, fertilizing the egg in the laboratory, and implanting any successfully created embryos in the female's uterus. The consent forms stated that "[a] specimen of sperm will be obtained from the Male Partner by masturbation" (i.e., fresh sperm), and also that "[i]n some cases, the sperm may need to be extracted directly from the testicle."

The embryo agreements set forth procedures for cryopreservation of "a portion of the embryos" resulting from the IVF procedures. Among other things, they provided options to Chin and Ivan for disposition of remaining cryopreserved embryos following divorce or death of one or both partners, which included discarding the embryos, donating them for medical research, or having them become the exclusive property of, and transferred to, Chin.

In the first two embryo agreements, Chin and Ivan selected the option for the embryos to become Chin's exclusive property in the event of Ivan's death during the storage period. However, on the third form signed on September 13, 2011, Chin and Ivan

7

selected the option to have the embryos discarded in the event Ivan died during the storage period. On the fourth and fifth forms signed on December 10, 2011 and March 13, 2012 respectively, Chin and Ivan changed their selection back to provide for the embryos to become Chin's exclusive property. Then, on the sixth embryo agreement signed by Chin and Ivan on May 30, 2012, they elected to have any remaining embryos donated to medical research.

Each IVF consent form and embryo agreement also included a signature block for a witness to attest to Chin's and Ivan's signatures, as well as a certification by a ZFC physician or nurse coordinator that he or she had discussed the medical procedure and the agreement with Chin and Ivan. For each of the IVF cycles using Chin's eggs, both Chin and Ivan visited ZFC together and signed the forms there in person.

After the sixth IVF cycle failed, Chin and Ivan sought to conceive using donor eggs. On September 21, 2012, Chin e-mailed ZFC asking for new consent forms to be sent to her for the IVF process using donor eggs (donor egg consent forms), because Ivan was scheduled to leave for Japan on September 24. The center e-mailed Chin the donor egg consent forms as requested. On September 24, Chin visited the center alone, bringing the forms with her, including signatures purportedly from her and Ivan. A ZFC employee "witnessed" the signatures—that is, she attested to Chin and Ivan each having signed the forms—even though she did not actually observe either of them signing.[6]

The donor egg consent forms provided that "the number of embryos will be determined at the time of the embryo transfer (but only after consultation with the Female Partner and the Male Partner)." In addition, in the "explanation of the medical procedure" section, the agreement provided that fresh sperm would be obtained from the

---

[6] Kathy contends that Chin forged Ivan's signature on the September 24, 2012 forms. Both Kathy and Zouves retained handwriting experts who provided conflicting testimony on this issue at trial.

Male Partner and then "placed in the culture dish with the egg or eggs for subsequent incubation, fertilization and cell division." Unlike the cryopreservation agreement, IVF consent forms, and embryo agreements, the donor egg agreement did not include any provisions for Chin and Ivan to specify how embryos should be used in the event one or both of them should die during any period of time.

### 3. Ivan's death and October 15, 2012 forms

Ivan died in Japan on October 13, 2012. Just prior to his death, he signed his final will, which stated: "after I pass away, I will give all my assets, which includes all properties, all company shares and others, etc. to my wife Kathy Pesic."

Chin went to ZFC a few days after Ivan died with three new consent forms, which already included signatures for her and Ivan dated October 15, 2012. The three forms consisted of: (1) "Informed Consent and Agreement for Cryopreservation of Embryo(s) for One Year Period After Ovum Retrieval";[7] (2) "Informed Consent for the Administration of Luprolide Acetate (Lupron) in Preparation for Controlled Ovarian Hyperstimulation"; and (3) "Shared Responsibility Plan Agreement."

Chin admitted at trial that she had signed Ivan's name on the October 15, 2012 forms. The parties to the lawsuit eventually stipulated that Ivan did not actually sign those forms.

As with the September 24, 2012 donor egg consent forms, a ZFC employee "witnessed" the signatures on the October 15, 2012 forms, even though she acknowledged that she did not actually observe Chin or Ivan sign them.

Chin did not present a death certificate to Zouves or otherwise inform Zouves that Ivan had died. Zouves did not actually learn that Ivan had died until 2013.

Although the October 15, 2012 embryo agreement referenced a companion IVF consent form—which Zouves requires to be signed for each procedure and which had

---

[7] This form is substantially similar to the six previous embryo agreements.

been signed for each prior IVF cycle—the record does not show that any such form was signed.

### 4. *Fertilization of donor eggs and resulting births*

In early November 2012, Zouves thawed Ivan's frozen sperm that had been banked on February 13, 2011, and used it to fertilize donor eggs. Two resulting embryos were then implanted in Chin's uterus on November 8, 2012. The procedure was successful and Chin gave birth to twins on July 8, 2013.

### 5. *Chin's claims against Ivan's estate and Kathy*

In May 2013, Chin filed a creditor's claim against Ivan's estate, seeking $8,995,000 in child support for her and Ivan's six-year-old child and the two unborn twins, as well as a petition to determine entitlement to distribution and to have the unborn twins declared as heirs of Ivan's estate.

After the claim was rejected, Chin filed a complaint in September 2013 against Kathy in her individual capacity and as the administrator of Ivan's estate to determine paternity and child support.

### B. *Procedural background*

Kathy filed the initial complaint in this action in October 2014, on her own behalf and on behalf of Ivan's estate, naming Zouves, Chin and Shelley Tarnoff as defendants.[8] In January 2019, Kathy filed the operative fourth amended complaint which alleged causes of action against Zouves for conversion, breach of fiduciary duty, negligence, and aiding and concealing stolen property in violation of Penal Code section 496.

Kathy and Chin settled in June 2019, with Kathy agreeing to pay $1.6 million in child support for the six-year-old child. The settlement agreement resolved all pending

---

[8] Tarnoff is a licensed family and marriage counselor to whom Zouves referred Chin and Ivan for psychological evaluation as part of the standard IVF process. Kathy dismissed Tarnoff from the action before the case against Zouves was submitted to the jury.

claims between Kathy and Chin, including Kathy's claims against Chin in this action. The settlement agreement also provided that Ivan is not the legally responsible parent for the twins and that the estate has no liability for their child support.

With respect to the remaining conversion claim against Zouves, Kathy alleged that she "was, and still is, the owner of all of Ivan's sperm that was cryogenically preserved by [Zouves], and Plaintiff, as Ivan's successor in interest, was and still is entitled to the possession of that sperm"; that Zouves "took Ivan's sperm belonging to Plaintiff and converted it to their own use, without Plaintiff's knowledge or consent"; that Zouves "substantially interfered with Plaintiff's property rights in that sperm by using the sperm without written notice to Plaintiff or to the Estate of Ivan Pesic . . . [and] Zouves's conduct is not excused by their lack of knowledge of Ivan's death, in light of the fact that they are strictly liable for the conversion"; and that Kathy "has, until present date, expended substantial sums of money as a proximate result of Defendants' conversion of said genetic materials in an amount according to proof at trial."

Zouves moved for summary adjudication of multiple causes of action, including the conversion claim. The court denied the motion on the ground that there was a "triable issue of material fact as to [Ivan's] intent and the ownership of his sperm at the time of his passing." Specifically, the court held there was evidence that the cryopreservation agreement expired at the end of its one-year term on February 6, 2012, because Chin and Ivan did not renew it in accordance with the terms of the agreement. According to the trial court, "when Pesic passed away on October 13, 2012, the Cryopreservation Agreement had arguably expired and its terms did not govern the disposition of Pesic's sperm. Furthermore, a reasonabl[e] jury could infer that Pesic intended his frozen sperm to be discarded after February 5, 2012, because he did not pay the storage fee or otherwise renew the agreement. [¶] Second, as Plaintiff persuasively argues, the consent

11

forms and embryo cryopreservation agreement subsequently signed by Pesic in 2012, do not address the posthumous use and ownership of Pesic's semen."[9]

The action proceeded to trial in October 2019.[10]  Prior to submitting the matter to the jury, Kathy dismissed the negligence cause of action against Zouves.  Only the conversion and "aiding in concealing stolen property" claims were submitted.

The jury instructions regarding the conversion claim included the following:  "The parties dispute the meaning of [the cryopreservation agreement]:  specifically, whether the agreement has expired.  Ms. Pesic claims that the words mean that the agreement expired on February 5, 2012, and after that date, Defendants were not permitted to use Mr. Pesic's semen without separate authorization.  Defendants claim that the agreement never expired; that renewal fees were not due pursuant to ZFC's custom and practice; and that the agreement was continued by the actions of Mr. Pesic, Ms. Chin and Defendants."

With respect to the necessary elements of Kathy's conversion claim, the court instructed the jury that:  "Ms. Pesic claims that Defendants wrongfully exercised control over her personal property.  To establish this claim, Ms. Pesic must prove all of the following: [¶] 1. That Ms. Pesic owned or had a right to possess Mr. Pesic's cryopreserved semen held at ZFC; [¶] 2. That Defendants substantially interfered with Ms. Pesic's property by knowingly or intentionally preventing Ms. Pesic from having access to the cryopreserved semen; [¶] 3. Ms. Pesic did not consent; [¶] 4. That Ms. Pesic was harmed; and [¶] 5. That Defendants' conduct was a substantial factor in causing the

---

[9] The ruling on Zouves's motion for summary adjudication was issued by a different judge than the one who subsequently presided over trial and granted Zouves's posttrial motions for JNOV and a new trial.  Kathy contends on appeal that the second judge did not have the "authority to overrule" the first judge's ruling on Zouves's motion for summary adjudication.  As we explain below, we need not address that argument.

[10] We include discussion of relevant trial testimony and evidence where appropriate in the substantive sections below.

12

harm. [¶] Conversion must be knowingly or intentionally done, but a wrongful intent is not necessary."

The jury returned a verdict in Kathy's favor on the conversion claim.[11] It awarded her $842,530.68 in damages, including $774,280.68 for legal fees incurred in defending Chin's claims, $68,000 in emotional distress damages, and $250 for the value of Ivan's frozen sperm.[12]

### 1. Motions for JNOV and new trial

After judgment was entered in Kathy's favor, Zouves moved for JNOV and a new trial on both liability and damages.

In the motion for JNOV, Zouves argued that Kathy failed to present substantial evidence to support her conversion claim because Zouves "did not have the necessary intent needed to convert [Kathy's] property," and "the owner of the property consented to the use." Specifically, it argued that, in taking Ivan's frozen sperm Zouves "did so in fulfillment of the bailment agreement with Ivan Pesic," referring to the cryopreservation agreement.[13] Zouves relied on case law holding that "[N]o conversion occurs when '[a] mere bailee, whether common carrier, or otherwise . . . receive[s] property from one not rightfully entitled to possession, and, acting as a mere conduit, deliver[s] it in pursuance of the bailment, if this is done before notice of the rights of the real owner.' " According to Zouves, Kathy's conversion claim could not be supported by substantial evidence

_____

[11] The jury found in Zouves's favor on the aiding and concealing stolen property claim, which is not at issue in this appeal.

[12] The relevant facts regarding the evidence of damages are set forth below in the section discussing Zouves's motion for new trial.

[13] As discussed further below, a bailment agreement " 'is [in a broad sense] the delivery of a thing to another for some special object or purpose, on a contract, express or implied, to conform to the objects or purposes of the delivery which may be as various as the transactions of' " people or entities. (*Needelman, Inc. v. DeWolf Realty Co.* (2015) 239 Cal.App.4th 750, 762, fn. 5, quoting *H.S. Crocker Co., Inc. v. McFaddin* (1957) 148 Cal.App.2d 639, 643.)

13

because Zouves, as the bailee, "had the owner's consent to proceed with the subject of the bailment."

Lastly, Zouves argued that the special verdict form improperly "directed the jury only to determine if Katherine Pesic owned Ivan Pesic's cryopreserved sperm, with no consideration for Ivan Pesic's actual intent." According to Zouves, "[t]his clear error was in contravention with California law, which demands consideration of the semen provider's intent in any designation of ownership and use."

With respect to damages, Zouves argued that substantial evidence did not support the award because the attorney fee billing records Kathy submitted lacked foundation and the emotional distress damages award was unsupported by the evidence.

In its motion for new trial, Zouves argued that "a new trial must be granted on the grounds of excessive damages, insufficiency of evidence to support conversion and error in law regarding conversion and damages." Specifically, Zouves argued that because the cryopreservation agreement unambiguously set forth Ivan's intent regarding posthumous use of his frozen sperm, it was error for the trial court to allow the jury to interpret it. In addition, it argued that the jury instructions and special verdict form included misstatements of law regarding conversion because there was no instruction regarding Ivan's intent. Lastly, with respect to damages, Zouves argued that the attorney billing records lacked foundation and that their admission stemming from discovery abuses by Kathy was "extraordinarily prejudicial."

The trial court granted both motions. In granting JNOV, the court first "assume[d] without deciding that [Kathy] presented substantial evidence to support a finding on the first element [of conversion]." For that reason, "[t]he discussion on this motion concerns the second element of conversion: 'that Defendants substantially interfered with Ms. Pesic's property by knowingly or intentionally preventing Ms. Pesic from having access to the cryopreserved semen.' "

14

The trial court then ruled that "the unambiguous language of [the cryopreservation agreement] shows that Defendants *were* authorized to undertake posthumous use of the cryopreserved semen, and the Court must exercise the judicial function of interpreting an unambiguous instrument." The court rejected Kathy's arguments that Zouves's posthumous use of the frozen sperm was conditioned on presentation of a death certificate, reasoning that the language in the agreement was for the benefit of Zouves and placed no obligation or restriction on it.

The trial court also rejected Kathy's argument that the cryopreservation agreement had expired because the parties had not paid to renew it. According to the court, the language of the agreement did not preclude Zouves from using the frozen sperm after February 5, 2012, one year after the agreement began, even though the parties never paid to renew it. Also, the custom and practice of the parties "showed without dispute that Defendants continued to store and use the semen after February 5, 2012, without a formal renewal."

For these reasons, the trial court held that, "[b]ased on the applicable law holding that a bailee lawfully in possession who complies with the bailment agreement is not responsible for conversion, judgment in favor of Defendants notwithstanding the verdict is warranted here."

In granting the new trial, the trial court found that "insufficient jury instructions and verdict form, the Court's failure to interpret an unambiguous contract, and the receipt of inadmissible evidence and consequent surprise warrant the granting of" the motion. Specifically, the court held that: (1) because the cryopreservation agreement was not ambiguous, "the court should have interpreted it" and instructed the jury on its meaning, and its failure to do so constituted an irregularity in proceedings pursuant to Code of Civil Procedure section 657, subdivision 1; (2) the jury instructions misstated the relevant law on conversion by including the language " 'wrongful intent is not necessary,' " and "additional instructions should have been given dealing specifically with a bailee legally

15

in possession"; (3) the jury instructions and special verdict form did not address Ivan's intent; (4) the jury should have been instructed concerning Ivan's consent; and (5) the admission of the attorney billings records was improper and created an unfair surprise because they lacked foundation and had failed to be disclosed in unredacted form during discovery.

Judgment in Zouves's favor was entered on January 7, 2020. Kathy timely appealed and Zouves timely filed a protective cross-appeal.

Following entry of judgment, Zouves filed a memorandum of costs. Kathy moved to tax and strike costs, which the trial court granted in part, ultimately awarding Zouves $218,748.02. Kathy timely appealed the order awarding costs (H048180).

## II. DISCUSSION

### A. *Kathy's appeal (H047915)*

#### 1. JNOV

The principal dispute on appeal is whether the cryopreservation agreement unambiguously gave Zouves the right to use Ivan's frozen sperm as it did, thereby defeating Kathy's conversion claim as a matter of law. Kathy contends it did not, chiefly because that right expired one year after the cryopreservation agreement was signed and Chin never provided a certified copy of Ivan's death certificate to Zouves.

She also argues that, even if the cryopreservation agreement had not expired, it was insufficient by itself to authorize Zouves to use Ivan's frozen sperm as it did because additional consent was required but not obtained.

Lastly, she argues that, even if no such additional consent were required, Ivan had impliedly revoked any prior consent from the cryopreservation agreement by indicating in the final IVF consent form he signed in May 2012 that he and Chin wanted all embryos to be donated for medical research in the event Ivan were to die during the following one-year period. Because substantial evidence supports the jury's verdict on her conversion claim, she contends, JNOV was improper.

16

Zouves argues the trial court correctly determined that the cryopreservation agreement unambiguously authorized Zouves to use Ivan's frozen sperm as it did and that "a bailee does not commit conversion when he complies with the bailment agreement." In addition, it argues that Ivan never impliedly revoked his consent through subsequent agreements and that no additional consent was required for Zouves to use the frozen sperm as it did. Zouves argues that Ivan's frozen sperm was not Kathy's property to begin with because the cryopreservation agreement excluded it from probate, so there was no evidence to support the elements of conversion.

Accordingly, Zouves contends, the trial court properly entered JNOV because there was no evidence that could have supported a jury finding that Zouves substantially interfered with Kathy's property by knowingly or intentionally preventing her from having access to the cryopreserved semen.

As we explain below, we agree with Kathy that the cryopreservation agreement did not unambiguously give Zouves the right to use Ivan's frozen sperm as it did. Instead, the agreement unambiguously provided that the storage period ended after one year if it was not renewed and that presentation of a death certificate was required before the frozen sperm could be used posthumously. It was properly for the trier of fact—in this case, the jury—to determine whether, given that interpretation, Zouves substantially interfered with Kathy's property. Here, the jury determined that Zouves did and we conclude substantial evidence supports that determination.

### a. Standard of review

An appellate court generally reviews an order granting JNOV to determine "whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 (*Sweatman*).) In doing so, the court views the record in the light most favorable to the verdict. (*Mason v. Lake Dolores Group* (2004) 117 Cal.App.4th 822, 829-830.)

17

"However, to the extent a motion for judgment notwithstanding the verdict raises legal issues such as the application of law to undisputed facts or the interpretation of a statute or contract, we review the trial court's ruling on the motion de novo." (*Brown v. City of Sacramento* (2019) 37 Cal.App.5th 587, 598 (*Brown*).)

Here, Zouves's motion raised the legal issue of interpretation of the cryopreservation agreement, which the trial court determined was unambiguous in a manner that mandated entry of judgment in Zouves's favor. Accordingly, we review that ruling de novo. (*Moore v. Wells Fargo Bank, N.A.* (2019) 39 Cal.App.5th 280, 287 (*Moore*) [trial court's ruling on threshold question of ambiguity is a question of law subject to independent review].)

We then review the jury's verdict for substantial evidence. (*Sweatman*, *supra*, 25 Cal.4th at p. 68.)

### b. Applicable law regarding conversion

" ' " 'Conversion is the wrongful exercise of dominion over the property of another.' " ' " (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1240 (*Lee*), quoting *Welco Electronics, Inc. v. Mora* (2014) 223 Cal.App.4th 202, 208.) "The gist of the action for conversion . . . is the wrongful interference with the owner's right of dominion and possession of his property." (*Chatterton v. Boone* (1947) 81 Cal.App.2d 943, 946.)

" ' " 'The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. . . .' " ' " (*Lee*, *supra*, 61 Cal.4th at p. 1240; see also *Voris v. Lampert* (2019) 7 Cal.5th 1141, 1150 (*Voris*).)

As our Supreme Court has explained, "[n]otably absent from this formula is any element of wrongful intent or motive; in California, conversion is a 'strict liability tort.' " (*Voris*, *supra*, 7 Cal.5th at p. 1150, quoting *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 144, fn. 38 [" ' "conversion rests neither in the knowledge nor the intent of the defendant" ' "].) " 'The *act* [constituting conversion] must be knowingly or

18

intentionally done, but a *wrongful intent* is not necessary.' " (*Multani v. Knight* (2018) 23 Cal.App.5th 837, 853 (*Multani*).)

"A successful plaintiff in a conversion action is entitled to recover '[t]he value of the property at the time of the conversion, with the interest from that time, or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted' plus 'fair compensation for the time and money properly expended in pursuit of the property.' " (*Voris*, *supra*, 7 Cal.5th at pp. 1150-1151, quoting Civ. Code, § 3336.)

### c. *Maxims of contract interpretation*

In reviewing a trial court's interpretation of a written contract, we begin "with the threshold question of whether the writing is ambiguous—that is, reasonably susceptible to more than one interpretation." (*Adams v. MHC Colony Park*, *L.P.* (2014) 224 Cal.App.4th 601, 619 (*Adams*), citing *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165-1166 (*Winet*).)

Determining whether an ambiguity exists "is not limited to the words of the contract." (*Adams*, *supra*, 224 Cal.App.4th at p. 620, citing *Scheenstra v. California Dairies*, *Inc*. (2013) 213 Cal.App.4th 370, 390 (*Scheenstra*).) Just as "[t]rial courts are required to receive provisionally any proffered parol evidence that is relevant to show whether the contractual language is reasonably susceptible to a particular meaning" (*Adams*, *supra*, at p. 620, fn. omitted), so too must an appellate court consider such evidence "when conducting its independent review into whether an ambiguity exists." (*Ibid*.) "In other words, appellate courts evaluate the instrument's language and relevant extrinsic evidence and decide whether, in light of the extrinsic evidence, the language is reasonably susceptible to the competing interpretations urged by the parties." (*Ibid*.)

### d. The cryopreservation agreement

Applying the standards set forth above, we independently determine that the cryopreservation agreement unambiguously provides: (1) that the storage period ends after one year if it is not renewed, at which point the frozen sperm will be thawed and discarded, and (2) presentation of a certified copy of a death certificate was required for Zouves to use Ivan's frozen sperm posthumously. We base this interpretation on two specific portions of the agreement: section 2, which sets forth the applicable "storage period" and terms regarding renewal of the agreement, and section 3, which sets forth provisions for use of the frozen sperm in the event either partner dies during the storage period.

#### i. Storage period and failure to renew the agreement

Section 2 provides in its entirety: "The Partners consent to the following procedure for cryopreservation (freezing) of the Male Partner's semen: [¶] a. The Male Partner will produce one or more samples of his semen which may then be cryopreserved (frozen). The semen samples to be cryopreserved will be cryopreserved by the laboratory personnel employed by the ZFC Center. The semen shall be stored frozen for the exclusive use by the Partners [Ivan and Chin] for the future fertilization of the Female Partner's Eggs, or in some cases a Donor's Eggs, unless the Partners otherwise direct the Physician in this Agreement or in a separate written agreement. [¶] b. All fees for the cryopreservation of the semen shall be paid in advance in accordance with the ZFC Center's fee schedule. [¶] c. The Female Partner and the Male Partner agree that the payment of the storage fee is for the specific period of time, as follows: 1 YEAR (12) months[.] [¶] d. At the end of the designated storage period, this Agreement with the ZFC Center for continued cryopreservation of the semen must be renewed, otherwise **the failure to renew the contract will result in the semen being thawed and discarded.** The number of renewals is unlimited. If this Agreement for cryopreservation is not renewed, the ZFC Center shall have the authority to discard the semen without prior

20

authorization from the Partners or if they are not living from their executors, administrators, trustees, successors, assigns or heirs. The ZFC Center has no obligation to notify the Partners that this Agreement is to expire or that it must be renewed. It is the obligation of the Partners to make sure that the storage fee is paid prior to the expiration of the designated storage period."

Thus, on its face, the cryopreservation agreement provides that the initial storage period is one year and that the agreement must be renewed at the end of that year; if it is not renewed, the frozen sperm *will be* thawed and discarded.

Zouves argues, as the trial court held, that section 2, "when read as a whole, placed on Dr. Zouves no **obligation** to dispose of the semen." Zouves claims that Kathy's interpretation of the agreement "would read subdivision (a) . . . out of the agreement in its entirety." We fail to see how the language in subdivision (a) qualifies or limits the remainder of section 2 that sets forth the storage period as described above. Instead, the opposite appears to be true—read as a whole, section 2 provides that the sperm will be frozen for the exclusive use by the Partners, but only for the length of the storage period. Any other reading would render the language regarding the storage period meaningless. (*United Farmers Agents Inc., Assn. v. Farmers Group, Inc.* (2019) 32 Cal.App.5th 478, 495 [courts strive "to 'give effect to all of a contract's terms, and to avoid interpretations that render any portion superfluous, void or inexplicable' "].)

Contrary to Zouves's assertion, Kathy's interpretation of the agreement does not read the right of "exclusive use" out of the contract; instead, it simply provides the time parameters for such exclusive use.

The trial court held that the language regarding payment of the storage fee "sets no restriction on future use by Defendants."[14] We do not read the agreement that way.

---

[14] Although we independently review the cryopreservation agreement to determine whether it is ambiguous, we address the trial court's ruling because Zouves largely relies (continued)

21

Instead, section 2 sets restrictions on future use by Zouves of Ivan's frozen sperm because it provides that at the end of the designated storage period, "failure to renew the contract will result in the semen being thawed and discarded." The mandated destruction of the semen necessarily restricts Zouves from using it.

The trial court also held that "the language is also explicit about the consequences of failure to renew: 'the ZFC Center shall have the authority to discard the semen without prior authorization . . . .' " According to the trial court, "[t]his section taken as a whole is clearly intended to give Defendants the contractual right (but certainly no obligation) to discard semen if there has not been a renewal and additional payment."

We do not read the agreement that way. Instead, it expressly provides that the failure to renew "will result in the semen being thawed and discarded." The other language in section 2—that Zouves has the authority to discard the semen without prior authorization—simply means Zouves does not have to notify Chin or Ivan before it discards the semen as required by the earlier provision. As the trial court construes the section, the failure to renew the agreement might not result in the semen being thawed and discarded—if, for example, Zouves simply elected not to discard it—which is directly contrary to the plain language of the agreement that it "will result in the semen being thawed and discarded." In short, we disagree with the trial court's conclusion that this section does not impose an obligation on Zouves to discard the semen if the agreement is not renewed. "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (Civ. Code, § 1638.)

---

on it in support of its arguments and because "to the extent a motion for judgment notwithstanding the verdict raises legal issues such as the application of law to undisputed facts or the interpretation of a statute or contract, we review the trial court's ruling on the motion de novo." (*Brown*, *supra*, 37 Cal.App.5th at p. 598.)

22

Zouves also argues, and the trial court held, that the parties' conduct and "standard practice" contradict Kathy's interpretation of the agreement on this issue. Zouves notes that, after the time Kathy contends the storage period ended, Chin and Ivan nevertheless came into the ZFC Center for multiple IVF cycles. In addition, Dr. Zouves testified that when "patients are involved in active treatment as this couple was, as a courtesy in 20 years *we've never billed people for storage if the treatment was ongoing*."

Similarly, the trial court held that Zouves "did not strictly enforce the one-year storage fee requirement, but rather had a practice of *not* discarding cryopreserved semen just because patients undergoing treatment had passed the 365-day mark without signing a renewal of the storage agreement and paying the renewal fee." Further, "in the case of Mr. Pesic and Ms. Chin, the custom and practice of the parties showed without dispute that Defendants continued to store and use the semen after February 5, 2012, without a formal renewal."

Again, we disagree. As we explained above, extrinsic evidence can be "relevant to show whether contractual language is reasonably susceptible to a particular meaning." (*Scheenstra*, *supra*, 213 Cal.App.4th at p. 390.) A reviewing court evaluates the contract's language and the relevant extrinsic evidence to determine whether "language is reasonably susceptible to the competing interpretations urged by the parties." (*Adams*, *supra*, 224 Cal.App.4th at p. 620.) And the terms of a contract can " 'be explained or supplemented by course of dealing or usage of trade or by course of performance.' " (*Southern Pacific Transportation Co. v. Santa Fe Pacific Pipelines, Inc.* (1999) 74 Cal.App.4th 1232, 1240, citing Code Civ. Proc., § 1856, subd. (c).)

Here, though, the extrinsic evidence of the parties' subsequent behavior does not support any other interpretation of the relevant provision of the cryopreservation agreement. Instead, as Zouves itself argues, the evidence shows only that Zouves allegedly elected to *disregard* the operative language in the contract and continued storing the frozen sperm despite the parties not having paid to renew the agreement.

23

The assertion is essentially that, although the plain language of the agreement says that Zouves will thaw and discard the semen if the agreement is not renewed by payment, the parties chose to waive that provision.

Although parties to a contract may elect to waive or modify a provision or condition precedent, that does not bear on the interpretation of the contract provision itself nor play a role in a court's threshold determination of whether the provision itself is ambiguous. (*Scheenstra*, *supra*, 213 Cal.App.4th at p. 390 ["If the court determines there is no ambiguity—that is, the language is reasonably susceptible to only one interpretation—then the judicial inquiry into meaning is finished and the clear and explicit meaning governs."].) Such evidence would only be relevant to a determination by the trier of fact as to whether such modification or waiver occurred.

Extrinsic evidence is also not admissible "to flatly contradict the express terms of the agreement." (*Winet*, *supra*, 4 Cal.App.4th at p. 1167.) Here, the cryopreservation agreement expressly states that, if it is not renewed, the semen "will be thawed and discarded." Zouves's alleged custom and practice of *not* discarding it directly contradicts those express terms.

Lastly, the relevant provision of the agreement also appears to be largely for the benefit of Ivan—it provided him the right to be assured that his frozen sperm will be discarded and not used if he elects not to renew the agreement. Zouves's interpretation based on the extrinsic evidence essentially seeks a forfeiture of that contractual right, but it is well settled that "the law abhors a forfeiture [and] [i]t cannot arise by implication, but can be effected only by clear and unambiguous language." (*Balian v. Rainey* (1952) 115 Cal.App.2d 10, 18; see also *Deutsch v. Phillips Petroleum Co.* (1976) 56 Cal.App.3d 586, 592 [strictly construing provisions against party seeking to benefit].)

In summary, we consider the cryopreservation agreement to be unambiguous in providing that the storage period ends after one year if it is not renewed, at which point the frozen sperm will be thawed and discarded.

### ii. Failure to present a death certificate

Section 3 of the cryopreservation agreement provides that, "[i]f at any time during the storage period either partner should die, the surviving partner shall provide the undersigned physician(s) and the ZFC Center with a certified copy of the death certificate. At that time the surviving Partner shall advise the ZFC Center of the following [pre-designated options regarding use of frozen sperm]."

Kathy contends this provision required Chin to provide a certified copy of the death certificate as a condition precedent to Zouves using Ivan's frozen sperm after his death. Zouves argues, as the trial court held, that this term was for the benefit of Zouves, and "[w]hile that sentence places an obligation on the surviving party to provide the certificate, it does not place any obligation or restriction on Defendants."

We agree with Kathy. First, the plain language of the agreement is mandatory: "the surviving partner shall provide . . . the death certificate." (*Woolls v. Superior Court* (2005) 127 Cal.App.4th 197, 208; *Woodbury v. Brown-Dempsey* (2003) 108 Cal.App.4th 421, 433 ["Ordinarily, the word 'may' connotes a discretionary or permissive act; the word 'shall' connotes a mandatory or directory duty."].) Section 3 then provides that, "[a]t that time the surviving Partner shall advise the ZFC Center of" which available pre-designated option it selects. In other words, only *at the time* that the other partner has died during the storage period and the surviving partner presents Zouves with a certified copy of the death certificate can the surviving party advise Zouves as to how to use the frozen sperm—in Chin's case, whether to have it thawed and used for in vitro fertilization, or to have it discarded.

Second, this provision was unmistakably for the benefit of Ivan as well as Zouves. As Zouves recognizes, the fundamental purpose of section 3 of the cryopreservation agreement is to specify how Ivan's frozen sperm may be used if either partner dies during the storage period. In other words, the section is entirely predicated on the death of one of the partners. The requirement that the surviving partner provide a certified copy of the

25

death certificate enforces that requirement by ensuring that neither partner can trigger section 3's provisions without providing proof that the other partner has actually died.

We do not agree with Zouves and the trial court that the provision merely reflects Zouves's "desire to be informed if one of the partners dies." The agreement does not say, for example, that the surviving partner shall "inform Zouves that the other partner has died"; instead, it expressly provides that the surviving partner shall provide a certified copy of the death certificate. On its face, the requirement is intended to do more than simply allow the surviving partner to inform Zouves of the other partner's death—it imposes a specific requirement of proof.

Under Zouves's interpretation, the female partner could more easily obtain and use the male partner's frozen sperm before his death through fraud, merely upon Zouves electing to proceed without seeing a certified copy of the death certificate. In our view, that would strip the male partner of his contractual right to ensure that his frozen sperm only be used after his death as specified in the agreement.[15]

Zouves argues that this provision of the agreement should not be construed as a condition precedent because they are "not favored in the law." While that general maxim may be true, it does not compel a result in Zouves's favor here.

A " 'condition precedent is either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises.' " (*JMR Construction Corp. v. Environmental Assessment & Remediation Management, Inc.* (2015) 243 Cal.App.4th 571, 593; Civ. Code, § 1436.) In general, " '[t]he existence of a condition precedent normally depends upon the intent of the parties

---

[15] It is immaterial for purposes of interpreting the cryopreservation agreement that Ivan was actually dead at the time that Zouves gave Ivan's frozen sperm to Chin. The cryopreservation agreement did not condition posthumous use of Ivan's frozen sperm solely on the male partner being dead; instead, it expressly conditioned it on presentation by the surviving partner of a certified copy of the death certificate.

26

as determined from the words they have employed in the contract.' " (*JMR Construction Corp.*, *supra*, at pp. 593-594, quoting *Realmuto v. Gagnard* (2003) 110 Cal.App.4th 193, 199.)  At the same time, " 'stipulations in an agreement are not to be construed as conditions precedent unless such construction is required by clear, unambiguous language; and particularly so where a forfeiture would be involved or inequitable consequences would result.' " (*JMR Construction Corp.*, *supra*, at p. 594, quoting *Alpha Beta Food Markets, Inc. v. Retail Clerks Union Local 770* (1955) 45 Cal.2d 764, 771; see also *Rubin v. Fuchs* (1969) 1 Cal.3d 50, 53 [contract provisions are not construed as conditions precedent in the absence of language plainly requiring such construction].)

Here, for the reasons set forth above, we conclude that the contractual language requires the construction we give it.

Zouves argues that Kathy's interpretation "seeks to mandate a forfeiture of [Chin's] rights."  We disagree.  Again, the words "[a]t that time," constitute clear and unambiguous language reflecting the parties' intent that the surviving partner must present specific documentation before any posthumous "right" is triggered.  Under our interpretation, Chin's right to posthumous use of Ivan's frozen sperm only arose if Ivan died during the storage period and after she presented Zouves with a certified copy of his death certificate.

Zouves also contends Kathy's interpretation is that Zouves "*was required to deny Ivan the right* to procreate using the semen he had previously banked for that very purpose because Ivan (and [Chin]) did not pay the storage fee."  On the contrary, Kathy's interpretation is that Ivan's right to procreate pursuant to the terms of the agreement did not arise until and unless two conditions were satisfied:  (1) Ivan died during the storage period, and (2) Chin presented Zouves with a certified copy of the death certificate.

Lastly, Zouves argues that, even if payment of the storage fee and provision of the death certificate were conditions precedent, Zouves could have waived them.  He cites the maxim that "the performance of such a condition [precedent] may be excused . . . by

27

reason of the conduct of the party in whose favor it is intended to operate [here, Dr. Zouves]." (Rest., Contracts, § 374.) As explained above, though, we interpret this provision of the agreement as intending the performance of the conditions to benefit Ivan, not merely Zouves, and Zouves has not identified any conduct by Ivan that might excuse their performance.

In summary, we determine the cryopreservation agreement unambiguously provided that the storage period ended after one year if it was not renewed, at which point the frozen sperm will be thawed and discarded, and that if a partner died during the storage period, the surviving partner was required to present a certified copy of the death certificate before Zouves had the right to allow use of Ivan's frozen sperm.

For that reason, the trial court's entry of JNOV on the basis of a contrary interpretation was improper. The jury should have been instructed as to our interpretation of the agreement as unambiguous, rather than being asked to interpret it. (*Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1451 [solely a judicial function to interpret unambiguous agreement].)

However, because the jury returned a verdict in Kathy's favor, any error in failing to instruct as to this court's interpretation was harmless. (*Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1217 [instructional error not grounds for reversal unless it is probable the error prejudicially affected the verdict].) Zouves has not argued to the contrary.

Our task then becomes determining—given our interpretation of the agreement— whether substantial evidence supports the jury's verdict. (*Sweatman*, *supra*, 25 Cal.4th at p. 68.)[16]

---

[16] Kathy makes a number of additional arguments for reversing the JNOV: (1) Zouves's failure to provide Ivan a form for consent to use of genetic material pursuant to Health and Safety Code section 1644.7 is evidence that Ivan did not intend for the cryopreservation agreement to give Zouves the right to allow Chin to use his frozen (continued)

28

### e. *Substantial evidence supports the jury's verdict on the second element of the conversion claim*

Only the second element of Kathy's conversion claim is at issue here. As the trial court stated in its ruling granting Zouves's motion for JNOV, "[t]he discussion on this motion concerns the second element of conversion: 'that Defendants substantially interfered with Ms. Pesic's property by knowingly or intentionally preventing Ms. Pesic from having access to the cryopreserved semen.' (CACI 2100, as tailored for this case.) The motion turns on a question of law: was evidence presented sufficient to prove that element?"[17]

Here, it is undisputed that Chin and Ivan did not renew the cryopreservation agreement by payment and that Chin did not provide a certified copy of the death certificate. Those facts constitute substantial evidence supporting the jury's determination, given our interpretation of the cryopreservation agreement.[18]

sperm after his death; (2) Zouves's failure to obtain Ivan's consent for the successful IVF cycle via a separate required consent form—as was used for each prior cycle before his death—is similar evidence of Ivan's lack of intent; (3) even if Ivan did intend for the cryopreservation agreement to give Chin the right to posthumous use of his frozen sperm, Ivan later impliedly revoked that consent by providing in the final embryo agreement form he signed on May 30, 2012, that all remaining frozen embryos shall be donated to medical research in the event of his death, and never be transferred to a recipient uterus; and (4) the trial court judge who issued the order granting JNOV and a new trial did not have the authority to overrule the previous trial judge who had denied Zouves's motion for summary adjudication on the ground that the cryopreservation agreement had arguably expired so that its terms did not govern the disposition of Ivan's sperm. Because of our interpretation of the cryopreservation agreement, we need not address these arguments.

[17] With respect to the first element of the claim—whether Kathy owned Ivan's frozen sperm at the time—the trial court "assumed without deciding" for purposes of the JNOV ruling that Kathy presented substantial evidence to support the finding. Zouves challenges that portion of the trial court's ruling in its protective cross-appeal, which we address below.

[18] The jury did not specify in its special verdict whether it found substantial interference by Zouves (1) because the storage period had expired, or (2) because Chin did not present the death certificate, so that Zouves was not authorized to use Ivan's
(continued)

Zouves does not contend on appeal that substantial evidence does not support the jury's findings under our interpretation of the agreement.

Instead, Zouves argues that "the court did not err in ruling that a bailee does not commit conversion when he complies with the bailment agreement."

The gist of Zouves's argument is that, as the trial court ruled, Zouves "could not have committed conversion because the Cryopreservation Agreement authorized the use of Ivan's semen." The trial court held that, because conversion requires that the defendant "be shown to have done some act implying the exercise or assumption of title, or of dominion over the goods, or some act inconsistent with the plaintiff's right of ownership" (*Steele v. Mariscano* (1894) 102 Cal. 666, 669), where "a bailee complies with the instructions of bailment, possession and use by the bailee does not prove conversion." Its ruling was predicated on its interpretation of the cryopreservation agreement as unambiguously allowing Zouves to use Ivan's frozen sperm as it did.

Because we interpret the cryopreservation agreement differently, we conclude that Zouves could have committed conversion because the agreement did not authorize the use of Ivan's semen after the storage period had expired or without the presentation of a certified death certificate. The question whether Zouves substantially interfered with Kathy's property was properly put to the jury as the trier of fact. Because substantial evidence supports the jury's findings, the JNOV must be reversed.

### 2. New trial

The trial court granted Zouves's motion for new trial as to both liability and damages. As we explain below, we find the order granting the new trial must be reversed as to liability because it is predicated on the trial court's interpretation of the

---

frozen sperm despite the storage period having been extended through the custom and practice of the parties. In either case, substantial evidence supports the finding.

cryopreservation agreement. However, we find that the trial court did not abuse its discretion in granting the new trial as to damages.

### *a.  Applicable law and standard of review*

The " 'right to a new trial is purely statutory, and a motion for a new trial can be granted only on one of the grounds enumerated in the statute.' " (*Wall Street Network, Ltd. v. New York Times Co*. (2008) 164 Cal.App.4th 1171, 1193.)

A "trial court may order a new trial based on surprise." (*McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 305 (*McCoy*), citing Code Civ. Proc., § 657, subd. 3.) "The surprise must have detrimentally impacted the party moving for a new trial, but the movant must not have been able to prevent or guard against it by ordinary prudence." (*McCoy*, *supra*, at p. 305.)

Code of Civil Procedure section 657 also states that "[w]hen a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated." Where the appellant does not dispute that the trial court complied with that requirement, "the appropriate standard of judicial review is one that defers to the trial court's resolution of conflicts in the evidence and inquires only whether the court's decision was an abuse of discretion." (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 636.)

Under that standard, the court's ruling "will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." (*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 (*Jiminez*).) "This is particularly true when the discretion is exercised in favor of awarding a new trial, for this action does not finally dispose of the matter. So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside." (*Ibid*.) That standard also "extends to all aspects of the trial court's order granting a new trial,

31

including the trial court's prejudice ruling." (*Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 160.)

Despite that generally applicable standard of review, "any determination underlying any order is scrutinized under the test appropriate to such determination." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 859.)

Here, the trial court's order granting a new trial as to liability is predicated on its interpretation of the cryopreservation agreement, which is a question of law which we review de novo. (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 859; *Moore*, *supra*, 39 Cal.App.5th at p. 287.)

We separately review the trial court's order granting the new trial as to damages for an abuse of discretion.

### b. The trial court's order granting a new trial on liability must be reversed

The trial court held that: (1) because the cryopreservation agreement was not ambiguous, "the Court should have interpreted it" and instructed the jury on its meaning; (2) the jury instructions misstated the relevant law on conversion; (3) the instructions and special verdict form did not address Ivan's intent; and (4) the jury should have been instructed concerning Ivan's consent. We address these in turn.

First, the court's ruling was premised on its interpretation of the cryopreservation agreement. As we have explained, we do not interpret it that way. For that reason, any instruction consistent with the trial court's interpretation would have been erroneous. (*Douglas v. Fidelity National Ins. Co.* (2014) 229 Cal.App.4th 392, 407 [whether jury instructions misstated the law reviewed de novo].)

Second, the trial court's holding that the instructions misstated the relevant law on conversion is incorrect as well. The instructions stated: "Ms. Pesic claims that Defendants wrongfully exercised control over her personal property. To establish this claim, Ms. Pesic must prove all of the following: [¶] 1. That Ms. Pesic owned or had a

32

right to possess Mr. Pesic's cryopreserved semen held at ZFC; [¶] 2. That Defendants substantially interfered with Ms. Pesic's property by knowingly or intentionally preventing Ms. Pesic from having access to the cryopreserved semen; [¶] 3. Ms. Pesic did not consent; [¶] 4. That Ms. Pesic was harmed; and [¶] 5. That Defendants' conduct was a substantial factor in causing the harm. [¶] Conversion must be knowingly or intentionally done, but a wrongful intent is not necessary."

The trial court held that it was misleading to include the language that "[c]onversion must be knowingly or intentionally done, but a wrongful intent is not necessary," because in the context of a bailment agreement, additional instructions should have been given regarding a "bailee acting in conformance with the terms of the bailment agreement."

But the instructional language regarding intent was an accurate statement of the law. (*Multani*, *supra*, 23 Cal.App.5th at p. 853 [the " '*act* [constituting conversion] must be knowingly or intentionally done, but a *wrongful intent* is not necessary' "].) And any instruction regarding a bailee acting in conformance with the terms of a bailment agreement based on the trial court's interpretation of the cryopreservation agreement would have been erroneous.

Third, the trial court's holding that "no guidance was given to the jury as to how to analyze Mr. Pesic's intent," is also predicated on its interpretation of the agreement, with which we do not agree. The trial court believed an instruction was necessary to inform the jury that, based on the court's interpretation of the cryopreservation agreement, Ivan had expressed his intent to transfer his frozen sperm to Chin, and that his will could not supersede that. Consistent with that, Zouves argues: "[b]y executing the Cryopreservation Agreement, Ivan unequivocally designated [Chin] as the proper recipient to control his frozen semen." We have rejected that interpretation of the agreement and any instruction based on it would have been improper.

Fourth, the issues of informed consent and the standard of care are not relevant to the jury's determination of the conversion claim, the elements of which are: " '(a) plaintiff's ownership or right to possession of personal property, (b) defendant's disposition of property in a manner inconsistent with plaintiff's property rights, and (c) resulting damages. . . .' " (*Voris*, *supra*, 7 Cal.5th at p. 1150.) The trial court's instructions to the jury and the special verdict form were consistent with that law. The concepts of informed consent and the standard of care pertained to Kathy's negligence claim, which was dismissed before the case went to the jury. Any instruction on Kathy's conversion claim relating to those issues would also have been improper.

Because the order granting a new trial was based on the trial court's interpretation of the cryopreservation agreement, it must be reversed. (See *Maher v. Saad* (2000) 82 Cal.App.4th 1317, 1323 (*Saad*) [where trial court based order granting new trial on erroneous concept of legal principles, order will be reversed].)

### c. *The trial court did not abuse its discretion in granting a new trial on damages*

The trial court granted a new trial as to damages on the grounds that a six-page chart of attorney billings prepared by Kathy had been improperly admitted because it lacked adequate foundation, which constituted an unfair surprise to Zouves pursuant to Code of Civil Procedure section 657.

Kathy argues that Zouves failed to properly object to admission of the chart, Zouves was not actually "surprised" within the meaning of Code of Civil Procedure section 657, and any error was harmless.[19]

---

[19] Kathy does not argue on appeal that there was adequate foundation to admit the chart.

34

### i. *Factual background*

During discovery, Zouves submitted interrogatories and requests for production of documents relating to Kathy's claimed damages. In response, Kathy submitted copies of invoices from her attorneys, redacting the description of the work performed. Zouves filed a motion to compel, seeking production of unredacted invoices so it could evaluate the claimed work. The trial court granted the motion, ruling that "[t]he complete redaction of the description of the services provided is fundamentally unfair because it precludes Zouves Defendants from conducting any meaningful cross-examination regarding the amounts incurred." The court ordered disclosure of "some general information regarding the nature of the services performed for the billing entries on the completed child support matter [which was] essential for a fair adjudication."

In response, Kathy produced less-redacted versions of the invoices a few weeks before trial commenced.

Later, with just one day of evidence remaining in the trial, Kathy provided fully unredacted copies of the invoices to Zouves for the first time. Roughly 10 days earlier, Kathy had subpoenaed the law firms that had represented her in the various lawsuits related to Ivan's extramarital children for copies of the fully unredacted invoices.[20]

Zouves's counsel objected to admission and use of the evidence on multiple grounds, including hearsay, lack of foundation and failure to comply with Evidence Code section 1560, subdivision (c). According to Zouves, "[t]here is not a clear designation or allocation within those bills as to how they are supposed to be separated out. [¶] Moreover, there is not a clear allocation from this case to the various parentage/child support cases. [¶] So there needs to be some foundation laid by the individuals who billed those services to identify what it was that was billed, what it was that relates to this case."

---

[20] Ivan had also fathered another child with a different Silvaco employee in 2008.

Kathy's attorney explained to the court that her intent was for Kathy herself to testify that she had received the invoices, that the reported work was actually done, and that she had reviewed much of the work and understood that the bulk of it "pertained to the twins' claims, but that there was other work that was done pertaining to [the other children]." Further, she would determine how much of the total fees pertained to the twins' claims, and testify "as to each law firm as to what methodology she used to determine—to estimate the amount of the attorneys' fees that she incurred and paid that pertains to the twins."

The next day, Kathy testified regarding the content of the invoices. She offered into evidence a six-page chart that she and her staff prepared, purporting to show the year, billing attorney, hours worked, amount claimed, and total fees incurred and paid for the lawsuits. Kathy claimed to have segregated the relevant fees—which related to actions involving the twins—from the irrelevant fees—which related to the actions involving Ivan's other extramarital children.

Through her own testimony, Kathy explained that she had created the chart by reviewing invoices provided by the various law firms she had retained, and on occasion speaking with the attorneys themselves to discuss the bills. Kathy did not seek to admit the invoices themselves into evidence.

Zouves specifically objected to admission of the chart "as to foundation." The trial court overruled the objection. In its motion for new trial, Zouves argued that the "attorney billing records were entirely without foundation because the Declarations of Custodian of Records accompanying each of plaintiff's attorney billing records pursuant to Evidence Code section 1560 complied with only the first three elements of section 1561," so that the six-page chart was "inadmissible hearsay and should not have been presented to the jury."

The trial court granted the motion, holding that the admission of the chart constituted an irregularity in proceedings (Code Civ. Proc., § 657, subd. 1), unfair

36

surprise (*id*., subd. 3), and error in law (*id*., subd. 7), and that it was prejudicial and warranted a new trial on damages. The court explained that Zouves "had only the time before the trial resumed the next morning to review [the fully unredacted invoices] and prepare to cross-examine Ms. Pesic."

### ii. Discussion

### (a) Adequacy of objection

Kathy contends that "[a] motion for new trial may not be granted by reason of erroneous admission of evidence unless the moving party had properly objected to such evidence," citing Evidence Code section 353, subdivision (a) as support. She argues Zouves failed to make an adequate objection by merely stating "[o]bjection as to foundation."

As a threshold matter, we note that the trial court's order did not address this argument, although Kathy had raised it in her opposition to Zouves's motion for new trial. Nevertheless, Kathy does not dispute that the trial court complied with the statutory requirement in Code of Civil Procedure section 657 that "the court shall specify the ground or grounds upon which it is granted and the court's reason or reasons for granting the new trial upon each ground stated." Therefore, "the appropriate standard of judicial review is one that defers to the trial court's resolution of conflicts in the evidence and inquires only whether the court's decision was an abuse of discretion." (*Oakland Raiders v. National Football League*, *supra*, 41 Cal.4th at p. 636.) Applying that standard, we construe the trial court's order as having determined that Zouves adequately objected and we review that determination for an abuse of discretion.

We conclude the trial court did not abuse its discretion in that regard. As the factual summary set forth above demonstrates, Zouves objected to the admission of the chart "as to foundation." If that objection were not clear enough on its own, it followed Zouves's multiple previous objections to the use and admission of the unredacted invoices on multiple grounds, including foundation. For instance, Zouves's counsel had

37

stated that "there needs to be some foundation laid by the individuals who billed those services to identify what it was that was billed, what it was that relates to this case," and then reiterated the concern over the "underlying foundational problems."

The trial court was well within its discretion to determine that Zouves adequately stated the objection.

Kathy notes that one of the purposes of the rule requiring adequate objection is to "fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*People v. Lucas* (2014) 60 Cal.4th 153, 264, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.)

Here, it is clear from the record that the trial court was fairly informed about the specific reasons for Zouves's objection as to foundation. In its ruling, the trial court understood that Zouves was arguing in its motion for new trial that the chart "was not admissible because the underlying invoices on which it is based were not admissible." Further, as the court explained, there was no showing at trial of how Kathy's staff members—who reviewed the invoices and prepared the chart—"made their decisions as to what fees to include or not include. No adequate foundation was provided for the admission of [the chart]." The trial court plainly understood the reasons Zouves believed the evidence should be excluded.

Lastly, Kathy analogizes to *People v. Modell* (1956) 143 Cal.App.2d 724, in which the court independently determined that an objection had been inadequate. The case is inapposite, though, as we do not exercise any independent review, but rather only evaluate whether the trial court abused its discretion in making its determination. (*Jiminez*, *supra*, 4 Cal.3d at p. 387.)

38

### (b) Unfair surprise

Kathy argues the trial court abused its discretion in determining that admission of the chart constituted "unfair surprise" to Zouves. She contends Zouves was not actually surprised, but instead elected to gamble on a favorable verdict and only claimed surprise after it lost.

The trial court determined that Zouves was surprised by Kathy's use of the unredacted invoices on the second-to-last day of trial, after she had refused to provide them to Zouves throughout discovery. As the court explained, "[a]pparently, sometime after trial started on October 7, 2019, Plaintiff decided that she needed to use the fully unredacted invoices that she had withheld throughout discovery." Despite that, she did not provide them to Zouves, even though they were "all obviously in her possession," but instead "began the process of serving subpoenas on the law firms seeking the fully unredacted invoices." As a result, Zouves was "for the first time provided with the fully redacted invoices, and had only the time before the trial resumed the next morning to review them and prepare to cross-examine Ms. Pesic."

We conclude the trial court did not abuse its discretion in finding this constituted unfair surprise to Zouves. It is well settled that a trial judge is " 'familiar with the evidence, witnesses and proceedings, and is in the best position to determine whether, in view of all the circumstances, justice demands a retrial.' . . . Review is limited to the inquiry whether there is any support for the ruling, and the order will be reversed only where there is a strong showing of abuse of discretion." (*Brandwein v. Rodriguez* (1955) 133 Cal.App.2d 433, 437; *McCoy*, *supra*, 216 Cal.App.4th at p. 306 [" '[e]ven the most comprehensive study of a trial court record cannot replace the immediacy of being present at the trial, watching and hearing as the evidence unfolds' "].)

Here, the record supports the trial court's discretionary ruling that Zouves was surprised by Kathy's introduction and use of the fully unredacted invoices, after having refused to provide them throughout discovery. " 'The discovery statutes are intended to

safeguard against surprise.' [Citation.] 'The rules of discovery contemplate two-way disclosure and do not envision that one party may sit back in idleness and savor the fruits which his adversary has cultivated and harvested in diligence and industry. Mutual exchange of data provides some protection against attempted one-way disclosure; the party seeking discovery must be ready and willing to make an equitable exchange.' " (*City of Fresno v. Harrison* (1984) 154 Cal.App.3d 296, 301.)

Kathy argues that if Zouves had not been pleased with her providing the redacted invoices during discovery, its remedy was to meet and confer with Kathy or file another motion to compel. That misses the point. The unfair surprise was not provision of the redacted invoices during discovery—rather, it was Kathy's new and unexpected decision to use the unredacted invoices at the end of trial after previously refusing to provide them.

The record also supports the trial court's determination that the surprise was prejudicial. (*Whitlock v. Foster Wheeler, LLC*, *supra*, 160 Cal.App.4th at p. 160 ["review for abuse of discretion extends to all aspects of the trial court's order granting a new trial, including the trial court's prejudice ruling"].)

Kathy argues that any error in admitting the chart was "rendered harmless" because Zouves's counsel introduced many of the invoices during cross-examination of Kathy, subsequently introduced a separate exhibit nearly identical to her chart, and put on its own expert witness to analyze the invoices. But the trial court was aware of those facts and nevertheless determined the error was still prejudicial because there was insufficient time for Zouves to sufficiently review the invoices and prepare to cross-examine Kathy. (*Saad*, *supra*, 82 Cal.App.4th at p. 1324 [" 'we must *presume* that the trial court did consider the whole record and decided that it had committed prejudicial error' "].) We cannot conclude that determination was an abuse of discretion. Merely because a party makes its best effort to cross-examine a witness and evaluate new evidence after it is provided at the last moment does not mean the surprise was harmless.

The trial court did not abuse its discretion granting the motion for new trial as to damages.

### B. *Zouves's cross-appeal* (*H047915*)

Zouves brings a protective cross-appeal challenging two aspects of the original judgment.

First, it argues that no substantial evidence supports the jury's award of $250 for the value of Ivan's frozen semen or the $68,000 in emotional distress damages. Zouves contends that "the evidence before the trial court (namely, the cryopreservation agreement) shows unequivocally that Ivan preserved his semen at ZFC without compensation, for the exclusive purpose of having a child with Joyce. Therefore, the jury's award of $250 for the value of the semen was not supported by substantial evidence and Dr. Zouves was entitled to JNOV on this issue."

We need not address these arguments because we remand for a new trial as to damages. (*Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 798-799 [reviewing court first considers main appeal from order granting new trial and decides protective cross-appeal only if it reverses the order].)[21]

Second, Zouves challenges a portion of the trial court's order on its motion for JNOV that was not in its favor, arguing no substantial evidence supports the jury's determination that Kathy owned Ivan's frozen sperm, so the trial court should have granted JNOV on that ground as well.

In an appeal of a trial court's order denying a motion for JNOV, "the standard of review is whether any substantial evidence—contradicted or uncontradicted—supports

---

[21] At oral argument, counsel for both parties took the position that, if this court were to remand for a new trial as to damages only, the retrial should encompass all aspects of the damages award, including the emotional distress damages and the value of the frozen semen. Consistent with that, as set forth in the disposition below, we remand for a new trial as to all damages.

the jury's conclusion." (*Sweatman*, *supra*, 25 Cal.4th at p. 68.) "Substantial evidence is evidence that is of 'ponderable legal significance,' 'reasonable in nature, credible, and of solid value,' and ' "substantial" proof of the essentials which the law requires in a particular case.' " (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006.)

Zouves argues that "Kathy did not own Ivan's semen because the Cryopreservation Agreement excluded it from probate." This argument is once again predicated on Zouves's interpretation of the agreement, which we have rejected. Here, the jury determined Kathy owned Ivan's frozen semen in November 2012. Zouves has not addressed the evidence in the record supporting that determination and shown why it is lacking, so we consider the point forfeited. (*In re S.C.* (2006) 138 Cal.App.4th 396, 414-415.)

Accordingly, the jury's verdict as to liability stands and we will direct the trial court to conduct a retrial as to damages only.

### C. *Kathy's costs appeal* (*H048180*)

Because we reverse the underlying judgment in appeal H047915, we must also reverse the costs award which is predicated on that judgment. (*Pico Citizens Bank v. Tafco, Inc.* (1958) 165 Cal.App.2d 739, 749.) Kathy's appeal from the order denying her motion to tax costs is therefore moot.

## III. DISPOSITION

In H047915, the judgment notwithstanding the verdict is reversed and the trial court is directed to enter a new order denying the motion for judgment notwithstanding the verdict. The order granting a new trial is reversed and the trial court is directed to enter a new order granting a new trial as to damages only.

In H048180, the appeal is dismissed as moot.

Each party shall bear its own costs on appeal.

_____
                                          Wilson, J.

WE CONCUR:

_____
       Bamattre-Manoukian, Acting P.J.

_____
              Danner, J.

<u>Pesic v. Zouves Fertility Center et al.</u>
H047915; H048180